Keener *vs.* The State.

No. 20.—HENRY C. KEENER, plaintiff in error, *vs.* THE STATE OF GEORGIA, defendant in error.

[1.] It is too late, after verdict, to move for a new trial on account of the incompetency of a Juror, whose disqualification was known to the prisoner before trial, and waived.

[2.] A defendant in a criminal case, is entitled only to a list of the witnesses sworn before the Grand Jury.

[3.] Ordinarily, a witness who testifies must state facts, and not his opinion or expectation, which is the conclusion of his mind, from the facts.

[4.] Where the character of a party, as to any particular trait, or as developed under special circumstances, is put in issue, it would seem that it should be established by evidence, as to general reputation, and not positive evidence of general bad conduct. Is there any material difference as to the two modes of proof? *Quere.*

[5.] All the circumstances of a transaction may be submitted to the Jury, provided they afford any fair presumption as to the matter in issue.

[6.] When previous threats, without any overt act, are sought to be introduced by the defendant, by way of justification, it must be shown that they had been consummated: *Aliter*, if used merely to show the state of mind or feeling on the the part of the deceased.

[7.] The remoteness or nearness of time, as to threats pointing to an act subsequently committed, can make no difference, so far as the competency of the testimony is concerned.

[8.] The duty of Courts in giving in charge to the Jury the law in criminal cases.

[9.] Verdicts find the *criminal* and not the *naked* fact; and to make a whole or a legal verdict, the Jury must find, for itself, the conclusion of law upon the facts.

[10.] If one kills another, under the fears of a reasonable man, that the deceased was manifestly intending to commit a personal injury upon him, amounting to felony, the killing is justifiable homicide; if the prisoner is under similar fears of some injury less than a felony, the offence is manslaughter, and not murder.

Indictment for murder, in Richmond Superior Court. Tried before Judge HOLT, January Term, 1855.

Henry C. Keener was placed upon trial for the murder of James Reese.

When the name of James Sikes, a Juror, was called, he

was put upon the *voire dire* and answered negatively, all the questions required to be propounded by law. He was put upon the prisoner, accepted by him, and sworn in chief to try said cause.

When the name of Samuel A. Verdery was called, he was put upon the *voire dire*, and in answer to the question, "Have you, from having seen the crime committed, or having heard any portion of the evidence delivered on oath, formed and expressed any opinion as to the guilt or innocence of the prisoner at the bar?" Said Juror answered that he had not, but that he had formed and expressed an opinion from what he had heard of the case. He answered the other questions negatively. The Attorney General pronounced the Juror competent, and he was accepted and sworn in chief, to try said cause.

In the progress of the cause, the Attorney General offered as an original witness, on the part of the State, one William A. Archer, whose name was not in the list of witnesses sworn before the Grand Jury, nor among those of whom the defendant had notice. Counsel for prisoner objected to said Archer's being sworn as an original witness on the part of the State, for those reasons. The Court over-ruled the objection, and Counsel for defendant excepted.

On the cross-examination of the State's witness, Goodwyn, Counsel for defendant propounded the question: "Whether the tone of voice, with the language and manner of deceased, at the time he walked through the piazza to the room in which the defendant was, were not such as caused him to expect or look for a difficulty?" The Court refused to allow the question to be asked, objection having been made by Counsel for the State, the Court holding that the witness could not give his opinion, but could only state the facts, which was sufficiently done by saying that the language was harsh and excited his attention. To which ruling, Counsel for prisoner excepted.

Counsel for prisoner having asked the witness, Prater, "whether he was acquainted with the general character of

deceased for violence in the place where the difficulty occurred," objection was made by the Counsel for the State. The Court, thereupon, refused to allow the question to be asked; to which ruling, Counsel for prisoner excepted. And the further question having been asked—"What was the character of deceased for violence in that particular place," and objection thereto having been made by Counsel for State, the Court refused to allow the question to be asked; to which ruling Counsel for prisoner excepted.

A witness, Cosby, was introduced and sworn on the part of the prisoner, and testified as follows:

JAMES COSBY, sworn for prisoner. Witness: On Friday night before the death of Reese, witness went in United States Hotel bar room and found Reese in there, and walked out into the hotel with him (Reese); he then remarked that he had not seen me on McIntosh street for a good while; witness replied that he had not been there for about 10 months; Reese then said that he did not go there as frequent as he used to do—that Keener had taken his woman from him; and he said that Keener was a damned coward, and that he had made him leave there two or three times, and that if ever Keener crossed his path he would kill him; he then said he was going out before long and kick up hell out there; this was either the Thursday or Friday night before his death; we then turned and walked down the street, and there was no more said about it.

The witness was then turned over, for cross-examination, to Counsel for the State, who immediately moved the Court to strike out from the record and withdraw from the Jury, all of said testimony of said Cosby, which motion was allowed by the Court; whereupon, Counsel for prisoner excepted.

In his charge to the Jury, the Court failed, omitted and declined—although requested by Counsel for prisoner so to do—to read to the Jury, or comment upon the 12th and 13th sections of the 4th division of the Penal Code, upon which Counsel for prisoner had mainly relied for his defence. The Court having read the 1st, 2d, 3d, 4th, 6th and 7th sec-

tions, then charged the Jury, that " the section of the Penal Code, applicable to the grounds on which the defence had been placed, was as follows :" (reading the 15th section.) To which failure, omission and refusal to charge, and charge as given, Counsel for prisoner excepted.

The Court was also requested, by Counsel for prisoner, to charge the Jury as follows :

1st. That if they believed, from the evidence, that the prisoner, at the time of the commission of the act, was under the fears of a reasonable man, that the deceased was manifestly intending to commit a personal injury upon him, amounting to felony, the killing was justifiable homicide.

2d. That if they believed, from the evidence, that prisoner was under similar fears of some act of violence and injury less than a felony, his offence was manslaughter, and not murder.

Which charge, so requested, the Court failed and refused to give; to which failure and refusal, Counsel for prisoner excepted.

A verdict of guilty was rendered. Whereupon, Counsel for prisoner moved the Court for a new trial, upon the grounds, viz : The several rulings of the Court excepted to as above, and also upon the following ground :

Because James Sikes, one of the Jurors sworn in chief, did not stand indifferent between the State of Georgia and Henry C. Keener, said Juror having, previously to being sworn, expressed decided opinions in relation to the guilt of the accused, and such strong prejudice against the accused, as rendered him an incompetent Juror in law, and which were unknown to the accused or his Counsel until after the verdict was rendered, as will appear by the annexed affidavits, the said James Sikes having previously answered, negatively, the usual question on the *voire dire.*

The following is the testimony in the case :

## TESTIMONY ON THE PART OF THE STATE.

EDWARD GREEN, sworn: Witness knows prisoner by sight. Was not present at the difficulty. It was in the City of Augusta, County of Richmond, State of Georgia. Was at the place between 7 and 8 o'clock in the evening where Reese was killed, at the house of Jane Yarborough, City of Augusta. Heard deceased's name mentioned. Some one tried to persuade prisoner to go away; said he would not; said he would kill or shoot the damned son of a bitch, whose name had just been mentioned, or any other rail road man. Prisoner alluded to Reese. Deceased was not there at that time, to my knowledge. These remarks were made in the back piazza of the house. Prisoner was sitting down at the time.

Cross: Did not know to whom prisoner was addressing. It was in the back stoop of the house. Heard Reese's name mentioned. There were several present. Does not think prisoner's remarks were, if the damned son of a bitch came there to run him off again, he would kill him. They were trying to get him off. Heard something said about Campbell Minstrells afterwards; supposed it be Campbell Minstrells from the name given them. Did not know what was said before he went in the house; left while they were talking. Said nothing about disturbing him. Said if he came there that night, he would kill or shoot the damned son of a bitch.

WILLIAM A. ARCHER, sworn: Witness knows defendant. Was present the night of the difficulty between Reese, deceased, and prisoner. It was in Richmond County in the early part of September last. Was there when Reese came in the parlor; he walked through into the back piazza—made some little noise, and hallooed out, "where is Keener, Yarborough's man?" I heard a voice which I supposed to be Keener's. I went out to where Reese was. Does not know Keener's reply. Mr. Reese was at the window, looking out on the back piazza. Reese went to the window and wanted

Keener *vs.* The State.

to go into the room where Keener was. Told. him (Reese) to open and come in. Reese had a knife in his hand; apparently an old knife, about six inches long.. Could not tell what kind of a knife it was; blade about six inches long; looked large for a pocket knife. It was tolerable dark. Reese was jobbing at the window with the knife, telling Keener to open, Keener telling him, "come in—you come in here, God damn you." Witness went and took hold of Reese; he jerked away from me. I took hold of him again, and asked him if he knew me. Said he did. Asked him to come away and not to raise any difficulty. He (Reese) said there would be no danger with a damned coward. Witness replied there was danger in a coward. Deceased said, "that is a fact," and went off. We walked off into the parlor peaceably, and sat down in the parlor. There was a deck of cards on the table. Witness picked up the deck and dealt off three cards apiece to himself and deceased. There appeared to be considerable moving about among the women. Sat there some little time. Heard some one stamp out in the piazza, and some one say "here I am." I went out in the piazza; saw Keener, and when I approached him he told me to stand off; I still approached nearer Keener, and he backed and told me again to stand off. Prisoner then called me and told me to come to him. Don't know whether he (prisoner) had anything in his hand at that time. Put my hand on his shoulder and commenced talking to him, and told him not to have any fuss there, and to go off; said he would not; that he had been run off several times; had been woke up out of his bed, time and again, and he did not intend to be run off any more. While we were talking in that way, Mr. Reese came out of the parlor, close by, within ten feet. Keener kept talking, but without speaking to Reese at all. Mr. Reese said, "you are afraid to point your pistol, you pusillanimous son of a bitch." Keener said, "what was that you said." Reese replied, "I said you are a pusillanimous son of a bitch." With that Keener raised his hand and shot with a pistol in his right hand. Prisoner then run. Witness

then went to Reese; asked him if he was hurt. Reese placed his hand to his belly and said he was shot. Witness helped Reese into the parlor. After I carried him into the parlor, he asked for water; gave him some. He took one swallow; laid him on the sofa; took him up and laid him on the floor. Witness sent for a physician as soon as he could. Physician came; it was Dr. Felder. I think Dr. Campbell was there. He was examined by the physicians. Two shot entered below the navel, and one shot struck deceased's watch. Witness remained there until Reese died. Thinks he lived about one hour. Do not know whose room it was that I heard the voice which I took for Keener's voice. Thinks it was the same room, the window of which Reese was jobbing his knife at. It was the room in the back part of the house; a person could get from that room; he could have gone into the street without going into the piazza, and could have gone into the piazza without going into the street. When I got to prisoner, he had the pistol in his hand; was not certain he had a pistol in his hand when he told me to stand back; had a stick in his left hand, walking stick, large stick; rather unusual size walking stick. Defendant was about four or five steps from deceased when he shot. Reese was still sitting down when he was shot, at the same place he was before he was shot. Saw no weapon in possession of Reese at that time; did not see any weapons on Reese after he was shot; he might have had some. Saw his pockets examined, and his money and watch taken. Saw Reese with a knife before the difficulty; saw no weapon about him after he was shot; does not know what Reese did with the knife he had at first; had nothing in deceased's hands at the time he was shot. Reese made no assault on Keener when he came out of the parlor, except in words. Jane Yarborough's house is called a whore house; that is the character of its inhabitants. One wound was a little below and to the right of the navel, about two and a half inches; the other wound was about five inches in the same direction. When Reese came out of the piazza, Keener was saying that he had been run off several times;

that he had been woke up out of his bed time and again, and would not do it any more.   Never mentioned Reese's name. This was said before and after Reese came into the piazza. It was said loud enough to be heard by any one in the piazza.   Reese never moved from the seat he took when he came. into the piazza until he was shot.

Cross: When witness went to the window, Reese was job-. bing at the window, demanding admittance—Keener reply-ing, "you come in here God damn you."   Reese saying, "you open and I will come in."   That was all Keener said at that time.   Does not recollect any person being with him and Reese, at the time Reese was jobbing at the window. There were several in the parlor when witness and Reese were in there.   There were several in the piazza; who they were he does not know; did not hear Reese ask any one for. a pistol; was standing by Keener, dissuading him from ha-ving any difficulty, at the time of the shooting; was near enough to put his hand on him; knife blade was about. five or. six inches long; the knife was larger than an ordinary pock-et knife.   When I went out in the piazza Keener was talking to me, and said he would not run off from him any more—mentioning no name. ` Reese came out and took a seat on the bench.   Witness understood, from prisoner's language, that it was Reese to whom he was referring when he said he would not run away any more.

By the State: Do not recollect how long it was from the time him and Reese went into the parlor, until he heard the. stamp in the piazza; it might have been ten minutes.

By the prisoner: It would probably take ten minutes for a man to dress.

By the State: The killing of deceased happened in Rich-. mond County, State of Georgia, about the 10th of September, 1854, (and that) after Reese was shot prisoner ran away. Witness left the cards in the parlor.

WILLIAM P. GOODWIN, sworn: Was present at the house of Jane Yarborough, at the difficulty between Reese and priso-

n'er, about the 10th of September last; knew nothing about the difficulty until some one, said to be Reese, came out of the parlor in the piazza; I was in the piazza; Reese walked up to a door and kicked it; some one inside said, "come in;" there were some oaths; does not know who used them; is not certain which used them; the person inside said, "come in;" the person outside said, "open the door and I will come in." The person in the room remarked, "wait until I dress and I will come out." Reese then walked off from the door with a gentleman. Heard nothing more of it for ten or fifteen minutes. Some one came out of a door, said to be Keener, speaking very harshly; stamped, and said, "here I am," and remarked, that he had been run away from there before, but would not be run away any more. Had in one hand a stick and the other a pistol. Some one on the end of the bench said, "you are afraid to point your pistol, you pusillanimous son of a bitch." Keener asked him to repeat it. Does not know whether he repeated or not. Keener then raised his hand and shot, and then turned and run; saw no more of Keener. Then looked up to Mr. Reese, the man that was shot; he was getting up from his seat after the fire. Then went to leave there; had to go through the parlor. The person who was shot was in there reclining on the sofa; left the house immediately, and came up town. Knew neither of the parties at that time; they were both strangers to me; heard their names called; it was the only way I knew them. Did not notice any one at the window of the room, the door of which Reese kicked at. Never noticed any person close to Keener. There were several persons in the piazza at the time. Does not know Archer. First notice I took of Keener, was when he stamped on the floor and spoke loud; he then had a stick and a pistol. Prisoner was about five or six steps from deceased when he shot him; had been in pizza once before. Saw no weapon about Reese at any time that evening; Reese was sitting on a bench and made remarks. Prisoner told him to repeat it. Saw no assault made by deceased on the accused.

Cross: Heard the language, "where is your Keener?" as Reese walked down to the room door. Reese was speaking harshly; went direct to the door. Reese's tone of voice was such as to attract the attention of witness; he spoke loud as he came down the piazza; was not looking at Reese when he was shot. When I looked at Reese after the shot, he was in the act of rising. Does not think that he said, on preliminary examination, that at the time of firing, Reese was in the act of rising. Immediately after the firing, and Keener turned, I looked and saw Reese in a rising attitude.

By a Juror: Keener came out of the door Reese kicked at.

By the State: Could see tolerably well by the light in the piazza.

WILLIAM L. FELDER, sworn: Witness is a practising physician; attended a gentleman said to be named Reese, at the house of Jenny Yarborough, on the 10th September, 1854; I arrived there about fifteen minutes after eleven o'clock; in the City of Augusta, County of Richmond; Reese was lying on his back on the floor; his pantaloons unbuttoned; there was blood upon the shirt, asked where he was shot; was told he was shot in the abdomen; raised his shirt and saw two holes, apparently made by balls; one wound was a little below the navel, about $1\frac{1}{2}$ inches; the other from $1\frac{1}{2}$ to 2 inches below that, inclining to right; could introduce the end of the little finger; appeared to be made with large buckshot; attempted to probe the wound in a perpendicular direction, but could not; the probe went into the abdomen. Witness is of the opinion that deceased died from those wounds.

Cross: The position of a person in a rising attitude, favors the course of the balls.

By the State: Sitting and bending over would favor the course of the balls.

By the Prisoner: The course of those balls would be favored by leaning forward when sitting, or in a rising attitude; would not undertake to say, from the course of those balls, that deceased was sitting or rising, but if they went in a di-

rect line, the course is consistent with either sitting and leaning forward, or in attempting to rise.

The State here closed.

## TESTIMONY FOR DEFENDANT.

EMMA BURNS, Sworn : Was present at difficulty between James Reese and Henry C. Keener, about the 10th September last ; Keener was very drunk in the forepart of the evening, cursing Campbell Minstrels ; first saw Reese that evening on Jackson street, opposite Globe Hotel ; between the hours of 10 and 11 that night, I saw Reese ; he walked down to Miss Yarborough's with Capt. Moody and witness ; Reese left us just before we arrived at Miss Yarborough's ; Reese asked witness if she had heard Keener curse him and the rail road men, and said if he had, he (Reese,) would make him retract those words when he saw him ; witness told Reese she minded her own business. Next saw Reese standing between the door and window in Miss Yarborough's piazza, with a knife in his hand and cursing, saying to Yarborough, " show up your Keener, I want to cut his damned throat ;" Reese then drew his knife across Yarborough's bosom, and said he had just as soon cut her's as not ; Reese then walked down to the end of the piazza, to the room which Keener was in ; Reese then commenced pounding or kicking at the door ; Reese wanted Keener to come out—called him out—witness cannot remember the words ; Keener did not then come out ; it was about ten minutes afterwards that Keener came out ; Reese then went from the door to the window, before Keener came out, and made an effort to get into the room ; Keener come out into the piazza—was cursing ; Reese then walked out of the parlor into the piazza ; Keener said he had been run off three times, and would not be run off again ; Reese then walked down the piazza and asked some one if they had a pistol—who, she does not know ; Reese then took his seat on the bench, with folded arms. At the same time Keener was talking, Reese called him a pusillanimous cowardly son of a

bitch. Mr. Archer had taken Reese from window once; was talking to Henry Keener. When Reese cursed Keener, Keener dared him to repeat it; Reese then repeated, "You are a damned, cowardly, pusillanimous son of a bitch; I dare you to point your pistol." Keener then fired.

When Reese was speaking to Keener, he was sitting on the bench, with his arms folded; at the firing, saw a movement; Reese said, "You damned, cowardly, pusillanimous son of a bitch, I dare you to point your pistol at me." After firing, Keener turned and ran; had seen Reese there about Saturday night fortnight before; he (Reese) came there with a party drinking, and asked for Keener as he usually did; Reese went to Miss Yarborough's room, and Keener jumped out of the window; don't remember what he said when he went to Yarborough's room; in the parlor he asked Yarborough where her man Keener was; "show up your Keener;" did not hear Reese use any violent language at the time Keener jumped out of the window.

One other time, Keener was there drunk; Reese was in a room; Keener did not go where Reese was, neither did Reese go where Keener was; Reese was standing at the door with pistol; there is one door to the room which Keener was in. (Diagram of the house exhibited to witness, and shown to the Jury.) Reese made a motion of his arm as he said, "I dare you to point your pistol." Witness was calm at the time.

Cross: Reese was at the parlor door, at a space between the door and window, when he said, "Show up your Keener;" was near the right hand window; did not see Keener when he came out of the room; was attracted by his cursing; was standing still; saw no pistol; had a stick in his right hand; saw the flash of the pistol; witness was standing at the parlor when the firing took place—at the left parlor window as I came into the piazza; was looking from one to the other; saw the flash of the pistol; Keener fired immediately after deceased called him a damned, cowardly, pusillanimous son of a bitch; Keener was about eighteen feet from deceased when he fired; Reese told Keener, when he (Reese,) first went to

the door to come out, that he (Reese,) was not armed. Reese was in the room of Martha Ruby in July last; the door was open at the time he placed the caps on the pistol. Does not recollect of having sworn on preliminary examination, before the Magistrate, on 13th November, 1854, at City Hall, Richmond County, as follows: "I saw Reese move around on bench; I was so excited I could not tell whether he turned around or not." Witness does not recollect using the word "excited," on preliminary examination; it must be a mistake of the Clerk. Witness has lived at Yarborough's off and on, about one year.

By the Prisoner: Received subpœna to attend Court in this case at Savannah.

AUGUTSUS PRATER, sworn: Witness had been acquainted with deceased for the last four or five years; has seen deceased at the house of Miss Yarborough; has met him there repeatedly; knows the reputation of deceased, as to violence in the neighborhood in which he lives; he was a passionate man when drinking; never saw him in difficulty when sober; would get into one with any one when drinking.

Cross: Has known deceased to get into a difficulty with witness; drew a sword cane on witness, but did not hurt him; has known him to have other difficulties in Atlanta; does not recollect the names of the persons he got into difficulties with; about four years ago; don't recollect of his having a difficulty in this county with any one else, except witness and Keener; the difficulty with Keener was at a whore house; at the time of the death of Reese, did not see it but heard of it; Reese was connected with the Georgia Rail Road at the time of his death, as witness believes, as conductor.

By the prisoner: In difficulty with witness and deceased, when he drew the sword cane, he did not hurt witness, but hurt Mr. Spencer; it happened at the house of Miss Yarborough.

WESLEY DONALDSON, sworn: Witness was at Miss Yarborough's about two weeks before Christmas, in the year 1853; in her bed chamber with Mr. Keener and herself;

while sitting, there came several persons to the front door; some one knocked at the door; Miss Yarborough asked who was there? The reply was, "a friend."

They then came to the room where we were sitting; knocked at the door several times, as if they were going to force the door, and demanded admittance; Miss Yarborough replied, she had company. Some one called out for Keener —"you damned coward!" "Bring out your man!" Then Miss Yarborough told the person at the door he was mistaken; that it was another gentleman in the room. Some one then kicked at the door very violently, as if to break it in. I stepped to the door and braced it; it was locked. While I was against the door, Mr. Keener took his hat and left by the other door; the other door leads into the parlor. There were then several of them shouted for Keener, and said, come out a damned coward, or they would break in the door. After Yarborough had closed the door, and I thought Keener had sufficient time to get out of the house, witness told them if they would wait, he would unlock the door and open it. Witness unlocked the door; Reese came in with a stick in his left hand and a knife in his right, and said he would kill Keener if he could find him; it was a bowie knife. Reese threatened Miss Yarborough's life for letting him escape, and said that if he ever caught him in the room with her he would kill him. After remaining in the room abusing Keener— calling every opprobious name, he (Reese) left by the same door; in a few moments we heard some one in the parlor who entered by the back door; Miss Yarborough opened the door and saw Reese; Yarborough called witness, and asked him to lock the back door after Reese left; after Reese stepped out witness locked the door.

Witness met Keener at the Shades next morning, and told him what I heard, and warned him if he went to Yarborough's house again. After Reese left, I heard several shouts for Keener, and heard several pistol shots; Miss Yarborough appeared to be alarmed, and asked if Keener was safe, and if he was gone. I told her he was. On Christmas day, in the

oafternoon, I walked up to Miss Yarborough's.    I walked int.
the back yard; went into the house by back door; Saw Yar-
borough and Reese standing in the passage; Reese kicked
the door and called for Keener, a damned cowardly son of a
bitch, to come out; it was a bed room door.    Reese raised.
his stick over Miss Yarborough's head, and told her if she did
not bring out her man Keener he would kill her.    Threatened
to stamp her guts out if she did not bring out her man.    Stood
in the passage a few moments and heard Reese and Yarbor-
ough quarrelling.    Walked out and went to pump near by.
When I got over to the pump I met Mr. Keener, and told him
Reese was over at the house, threatening his life.    Keener
took hold of witness' arm and asked him to walk down town
with him.    I gave my assent and we then went; crossed over
by the Infirmary, and came down to Jackson street.    When
we had proceeded some distance, we turned and observed
Reese following him.    Mr. Keener then quickened his pace.
I then asked him if he did not think Reese would think he·
was afraid of him, if he saw him trying to get out of his way..
Keener replied that he did not want any difficulty with him,
and wanted to keep out of his way.    We then reached Gan-·
ter's bar-room.    Keener asked witness to take a glass; wit-
ness accepted the invitation, and walked into the bar-room
with him; went in and took a glass together; also took a ci-
gar.    Mr. Keener then asked me to step to the door and see
if I saw Reese.    I then returned and told him I did not see·
him; thought he had passed.    We then went to the Shades:

Cross: No one else was in the room with us at the time of
the first difficulty; there were several persons in the passage;.
don't know who they were; there were several ladies in the
house, viz: Miss Copperfield, Miss Irvin and Miss Brown;
several others were there whose names I do not know; there
were several persons at the door, whom he does not know;
saw no one at the second difficulty except Reese and Yarbo-
rough; the doors were all closed.    Witness believes the same
ladies resided there at the time of the last difficulty as at the
first one; saw them there before and after the last difficulty;.

Keener *vs.* The State.

was brought here from South Carolina on the 22d December last; has had no opportunity of conversing with prisoner while in jail; I saw him several times. Witness has been convicted of simple larceny at this term of the Court, and plead guilty in second case; stealing negroes, as it appears; has been in jail here several times. ·

By a Juror: Was in Miss Yarborough's bed-room previous to the addition being put to the house; witness believes she occupies another room.

JAMES COSBY, sworn: (Rejected by the Court.) On the Friday night before the death of Reese, witness went in United States Hotel bar room and found Reese in there, and walked out into the street with him (Reese); he then remarked that he had not seen me on McIntosh street for a good while; witness replied that he had not been there for about 10 months; Reese then said that he did not go there as frequent as he used to do—that Keener had taken his woman from him; and he said that Keener was a damned coward, and that he had made him leave there two or three times, and that if ever Keener crossed his path he would kill him; he then said he was going out before long and kick up hell out there; this was either the Thursday or Friday night before his death; we then turned and walked down the street, and there was no more said about it.

The last ground of motion for new trial was supported by the following affidavits:

STATE OF GEORGIA, RICHMOND COUNTY:
*In the Superior Court of said County.*

Personally appeared in open Court, William Cauley, who being sworn, says that on the twenty-third day of January, 1855, James Sikes, who was afterwards sworn in chief as a Juror to try the case of The State *vs.* Henry C. Keener, in a conversation with deponent, referring to said case, made use of the expression, that said "Keener ought to have his neck broke." And deponent further says, that said conversation

took place in the Jury-room in the City Hall, in said county, when the Jury was considering the case of John P. King *vs.* Jones & Cumming.

his

.WILLIAM X CAULEY.

mark.

Sworn to and subscribed in open Court, this 30th day of January, 1855.

OSWELL E. CASHIN, Clerk.

STATE OF GEORGIA, RICHMOND COUNTY:

Personally appeared, Thomas W. Miller and John K. Jackson, who being sworn, say that they were Counsel for the prisoner in the foregoing case, and that the facts stated in the foregoing affidavit were not known to them, or either of them, until after the verdict was rendered, and that they do not believe that they were known to their associate Counsel, A. H. Stephens, Esq.

T. W. MILLER,

JOHN K. JACKSON.

Sworn to 31st January, 1855.

W. MILO OLIN, J. P.

STATE OF GEORGIA, RICHMOND COUNTY:

Before me appeared Henry C. Keener, the defendant, who being sworn, says that he did not know the facts set forth in the above affidavit of William Cauley, until after the verdict was rendered.

HENRY C. KEENER.

Sworn to and subscribed before me, the 31st Jan. 1855.

G. F. PARISH, J. I. C.

Upon the hearing, the State produced the following affidavits:

STATE OF GEORGIA, RICHMOND COUNTY:

Personally appeared, James Sikes, who being sworn, says

that he has no recollection of ever having made use of the expression to William Cauley, "that Keener ought to have his neck broke;" that he has no recollection of having made use of said language, either in the Jury room, while on the trial of the case of John P. King *vs.* Jones & Cumming, or elsewhere. Deponent thinks that if he had made use of any such expression, he would now remember it. Deponent further swears, that he was a stranger, both to the deceased and the prisoner, in said case, and that he had no prejudice against the said Keener; but that he stood indifferent between the State of Georgia and Henry C. Keener, the prisoner.

JAMES SIKES.

Sworn to and subscribed before me, this 18th day of February, 1855.

HEZ'TT WILLIAMS, J. P.

STATE OF GEORGIA, RICHMOND COUNTY:

Personally appeared, Hugh O'Neill, who being duly sworn, says that he was one of the Jurors in the above stated cause; that the conduct of James Sikes, while serving with him on said Jury, was decorous and proper; that he manifested no prejudice against the defendant; that the Jurors, generally, had determined upon their verdict when they went to the Jury-room, and that Sikes neither attempted to exert, nor really did exert, any influence in the finding of their verdict.

HUGH O'NEILL.

Sworn to and subscribed before me, this 19th day of February, 1855.

JOHN H. SPENCER, J. P.

Two other Jurors made similar affidavits.

Upon the hearing, prisoner's Counsel produced the following additional affidavit:

STATE OF GEORGIA, RICHMOND COUNTY:

Personally appeared, Isaiah R. Butler, who being sworn, says that he was raised with James Sikes, and has known

him from early boyhood; that said Sikes has always been reputed to be a man of weak and unsound mind, and been so known among his neighbors and acquaintances; that sometime during the week in which the case of the State *vs.* Henry C. Keener was tried, and before said Sikes was sworn to try said case, at Augustine Frederick's, in the City of Augusta, he, deponent, heard said Sikes say that he had been summoned as a Juror, and that if he was sworn on the case against Keener he would be damned if he would not crack his neck. Deponent further says he afterwards heard said Sikes, at the Court House in said City, repeat the same language, in substance.

ISAIAH R. BUTLER.

Sworn to and subscribed this 20th February, 1855.

DANIEL S. BUSH, J. P.

Whereupon, the Attorney General asked for further time to procure additional affidavits in support of the Juror, and time was allowed by the Court.

On Friday, the 23d of February, 1855, the Attorney General offered the following affidavits:

STATE OF GEORGIA, RICHMOND COUNTY:

Personally appeared in open Court, James Sikes, who being duly sworn, saith that he was a Juror on the case of the State *vs.* Henry C. Keener, in the Superior Court of said County; that he has seen the affidavit of Isaiah Butler, stating certain remarks as made about said Keener by this deponent; and deponent denies having made the remarks therein stated, or any such remarks, to said Butler, or in his presence, or to any other person. Deponent is certain that if he had used such language, he would not have forgotten it. In fact, he saith that he had no such feeling or bias towards Keener to cause such language; that he has known said Butler for a long while, and affirms, to the best of his recollection, that during the sitting of the present term of this Court, he never saw said Butler at all, saving once, and that was on or about

Keener *vs.* The State.

Tuesday of the first week; while passing out of the Court House, some one, whom deponent took to be Butler, bowed to him and he returned it ; more than that, not a word passed between them ; and if they had been in Fredrick's, as stated in Butler's affidavit, deponent is satisfied, under the circumstances, that he would remember it; moreover, deponent, before coming to Court, does not remember whether he ever heard any particular mention of the homicide of Reese by Keener ; certainly was entirely free from any bias or prejudice against Keener ; nor ever expressed any opinion about the defendant, previous to the trial.

JAMES SIKES.

Sworn in open Court, February 23d, 1855.

O. E. Cashin, Clerk.

State of Georgia, Richmond County :

Personally appeared, James A. Templeton, who, being duly sworn, saith that he knew James Sikes, Juror in the case of the State *vs.* Henry C. Keener, and has lived in his neighborhood, and in fact in half a mile of said Juror, for about twenty-two years ; that he is a man of ordinary mind, neither very extraordinary nor weak; that he is one of the best of blacksmiths in deponent's part of the country; that he is considered by deponent and by the neighbors, a sober, industrious and saving man ; that he owns a place, where he lives, which was purchased by his industry.; that as to character for truth and veracity, deponent knows no cause, personally or from information, why he should not be fully credited, and that under oath, he would put the same faith in him as in other men ; that deponent is of.the opinion that the said Sike's memory is not defective, but very good.. The family of said James Sikes is respectable.

. JAMES A. .TEMPLETON.

Sworn to and subscribed, this 22d, Feb. 1855.

Wm. T. Gould, Judge C. C. Pleas,

    City of Augusta.

Keener *vs.* The State.

STATE OF GEORGIA, RICHMOND COUNTY:

Personally appeared before me, John T. Palmer, a citizen of Burke County, who being duly sworn, saith that he is a practising physician, and acquainted with James Sikes, Juror, (as informed,) in the trial of Wm. C. Keener, for murder in first aforesaid county, and has been for about twenty or more years; that in his opinion said Sikes is a man of about ordinary mind, no indication of weakness or any extraordinary strength; that in fact, deponent hath known said James pretty much all his (deponent's life; that said James is a man who will run on and jest, but under oath, deponent hath no reason to distrust him, and would rely upon his statements thereunder made.

JOHN T. PALMER.

Sworn to before me this 21st day of February, 1855.

JOHN H. SPENCER, J. P.

The reception of the last two affidavits was objected to by prisoner's Counsel. The objection was over-ruled, and prisoner's Counsel excepted.

Upon the reception of the affidavits of Palmer and Templeton, prisoner's Counsel asked for additional time to furnish affidavits in support of Butler's, in relation to the unsoundness of the mind of the Juror, Sikes, stating that they had just come to the knowledge that said Sikes had been removed from a trustship in this Court on that account, and that the fact could be shown. The Court refused to allow time, and thereupon prisoner's Counsel excepted.

On the 24th day of February, 1855, the Court proceeded to pronounce its decision upon said motion for a new trial. The motion was over-ruled and a new trial refused. Whereupon, prisoner's Counsel excepted.

Upon these several exceptions error has been assigned.

T. W. MILLER; A. H. STEPHENS, for plaintiffs.

Attorney General SHEWMAKE, for the State.

Keener *vs.* The State.

*By the Court.*—LUMPKIN, J. delivering the opinion.

[1.] We propose to consider the grounds of error complained of in this case, in the order in which they are presented in the assignment; and the first is, that the Court did not set aside Samuel A. Verdery, but allowed the Attorney General to put him upon the prisoner as a competent Juror.

When the name of Samuel A. Verdery was called, he was put upon his *voire dire;* and in answer to the question— "Have you, from having seen the crime committed, or having heard any portion of the evidence delivered on oath, formed and expressed any opinion as to the guilt or innocence of the prisoner at the bar?" Said Juror announced that he had not, but that he had formed and expressed an opinion from what he had heard of the case. He answered the other questions propounded by the Statute negatively. The Attorney General pronounced the Juror competent, and he was *accepted* and sworn in chief to try the cause.

Whether Mr. Verdery was a competent Juror, we are not called upon to decide. True, he was pronounced qualified by the State's Attorney, but not by the presiding Judge. His opinion, as to whether or not the Juror stood indifferent, was not invoked; and yet, it was the only judgment which this Court is authorized to review. There has been no decision by the Court below upon this point. Not only was no attempt made by the prisoner to get rid of the Juror, by making the question to the Judge, but he failed to put him upon triers, to test his competency, as he was entitled to do under the Act of 1843. He *accepted* the Juror as he was—and consented, without objection, that he should be sworn in chief, to try the traverse. And it is a maxim of the English Law, as well as of common sense, that no one can take advantage of a wrong which he, himself, agreed to.

This doctrine underwent a thorough investigation by the Judges in Convention in *Glover vs. Woolsey, & Co. (Dudley's R.* 85.) It is true, that was an action of *assumpsit;* but the

reasoning of the Convention, as well as the authorities cited, apply to criminal as well as civil causes.   It is there laid down as a well settled rule, that an omission to challenge a Juror before trial, is a waiver of the objection to him; and that it would be most unreasonable to allow a party the benefit of a verdict, if favorable to him, and the benefit of a new trial on account of the objection, if the verdict should be adverse.   In one of the cases referred to, *Jeffries et al. vs. Randall,* (14 *Mass. R.* 206,) the Court say, " Had the demandants made the requisite Statutory inquiry, *and failed of discovering the fact which would have disqualified the Juror,* it would have been equitable to have granted relief at this stage of the proceeding; but having omitted to avail themselves of their rights when the Jury was empannelled, the motion cannot now obtain."

And so we say in this case.

[2.] In the progress of the cause, the Attorney General offered as an original witness, on the part of the State, one Wm. A. Archer, whose name was not on the list of witnesses sworn before the Grand Jury, nor among those of whom the defendant had notice.   Counsel for prisoner objected to said Archer's being sworn as an original witness on the part of the State, for those reasons.   The Court over-ruled the objection, and Counsel for the prisoner excepted.

It is insisted that Archer was incompetent to testify, and the 7th section of the 14th division of the Penal Code is relied upon for his exclusion.   It is in these words: " Every person charged with a crime or offence which may subject him or her, on conviction, to death or imprisonment in the Penitentiary for the term of three years or more, shall be furnished, previous to his or her arraignment, with a copy of the indictment, and a list of the witnesses who gave testimony *before the Grand Jury.*"   (*Cobb's Digest,* 834.)

In the case of *Stokes against The State,* recently determined at Milledgeville, this Court held, that the defendant was entitled only to a list of the witnesses who gave testimony before the Grand Jury.   Such is the definite language

of the Code; and if ever the maxim, that the express men--
tion of one thing implies the exclusion of another, is to have
a practical application, no case can occur more palpable than
this.

True, a different construction was put upon this clause by
the late THOMAS N. P. CHARLTON, Judge of the Eastern Cir--
.cuit, in *The State vs. Calvin and others*, (*R. M. Charlton's*
*R.* 142.) And the reason assigned was, that as one of the
authors of the Penal Code, he was solicitous to place
persons accused under our law, upon as high a scale of. dig-
nity as was dictated by the wide difference between a citi-
.zen of a Republic · and the subject of a Monarchy. · Hence,
every person committing a *felony* in this State, should be
placed upon the same footing as a subject of England charged
with *treason*. And that as by the Statute of *Ann*, a prisoner
charged with *treason*, was entitled to a list of *all* the witness-
es to be produced, with their professions and places of abode,
the like provision was incorporated with our Code, the better
to enable defendants, by inquiry into the characters of the
witnesses, to make their defence.

However much we may admire the humanity of the motive
which prompted this interpretation, we most respectfully sub-
mit, that both the distinguished Jurists who framed the Code,
as well as the Legislature which adopted it, were most impor-
tunate in the use of the terms employed, if the exposition of
Judge CHARLTON be correct. And we coincide with His
Honor, Judge HOLT, that it is not safe to inquire what the
.framer of the law thought when he drafted it, but what the
Legislature intended when they passed it; and that this in-
tention is to be gathered from the words used, taken in their
plain and obvious sense; and that it is very .clear, that all
that was designed was, to let the accused distinctly know,
before arraignment, the charge brought against him—the
.prosecutor who preferred it, and the witnesses who gave. tes-
timony before the Grand Jury. This is all that is expressed.
Had it been designed to limit the State, on the trial, to any

particular set of witnesses, some words of restriction would have been used. Here there are no such words. The Statute of *Ann* contains the words, " a list of witnesses to be *produced*." Ours, " a list of the witnesses who gave testimony before the *Grand Jury.*" How widely different the phraseology! And yet, they are treated, in the decision to which we have referred, as not only the same in reason and principle, but one is considered but the re-enactment of the other.

We affirm the judgment of the Circuit Court upon this point also.

[3.] As to to third ground: A. witness, Goodwyn, introduced by the State, on cross-examination, was asked "whether the tone of voice, with the language and manner of the deceased at the time he walked through the piazza to the room in which the defendant was, was not such as to cause him to expect or look for a difficulty?" This question was not allowed to be put, but the witness was permitted to testify what the tone of voice, language and manner of Reese, at the time, were, which he did.

We regret that this question was not suffered to be propounded, because of its entire immateriality. Every body, at the house where this homicide was committed, that night, expected a difficulty, as a matter of course. There could have been but one answer to the interrogatory, and that would not have weighed a feather with the Jury; and yet, hours, perhaps, have been consumed, first and last, in discussing the rule of evidence applicable to the facts contained in the record. We subjoin the reasons given by the Judge for rejecting this testimony, in his own language :

" This question was not allowed to be asked, because the answer would not be as to a fact, but the expectation of a witness, arising out of a series of facts, either then in evidence or capable of being put in evidence. Now the expectation of the witness was nothing more than the deduction or conclusion of the mind of the witness, as to the effect which these facts produced on his mind, and inferentially, would be likely to produce on the mind of Keener."

Keener *vs.* The State.

"It is not for a witness to draw such conclusions; that belongs to the Jury. This is the general rule of law—to which, however, there are exceptions: as in questions of sanity or insanity, art or science, and others of a like nature, in which the *opinion* of a witness, founded upon facts too multitudinous and minute to be presented to the mind of Jurors, or of a skill, the witness' own, is admitted. There is another class of exceptions, founded chiefly on defect of memory, in which the witness may give his belief: such as questions of personal identity, handwriting, &c. and others, in which he may state his *impressions* or *understanding*. Such were the cases of *Moody and Wife vs. Davis*, (10 *Geo. R.*) and *Fielder and others against Collier*, (13 *Ga. R.*) But the Court does not find the case before it to be within any of the exceptions. The question asked the witness was, as to what he expected from the conduct of Reese—which conduct was intended to be proved by the impression it made on his mind; or, as expressed by one of the Counsel, a daguerreotype likeness of his conduct, as reflected from the mind of the witness, was wanted. It was certainly important to ascertain what was the conduct of Reese on that occasion, even to the minutest action. But the mirror from which it was sought to have it reflected, may not have been true. There may have been the seams of credulousness, timorousness, passion or prejudice to disturb the likeness; and which may have been very different from that which would have been made on the mind of the Jury by a simple statement of facts."

Our brother, we believe, has stated, with accuracy, the rule as laid down in the books. (1 *Greenlf. Ev.* §440.) And yet, the writer from which it is taken, cites with approbation the case of *McKee vs. Nelson*, (4 *Cowen*, 355,) in which it was held, that in an action for breach of a promise to marry, a person accustomed to observe the mutual deportment of the parties may give in evidence *his opinion* upon the question, whether they were attached to each other; and that, too, without it being made to appear that the witness was an *expert* in the affairs of the heart.

The Court admit the general rule as stated by Judge HOLT, namely: that witnesses are not allowed to give their opinions to a Jury, but suggest, that there are a thousand nameless things, indicating the existence and degree of the tender passion, which language cannot specify, and which cannot be detailed to a Jury. Why, we would ask, may not the various facts which manifest the existence of *attachment,* be as capable of specification as any other matter whatever? Why may not the existence of *love,* as well as *revenge,* being both of them elementary principles of human nature, be proven by external signs and the multiplied exhibitions of its energy? There is no radical difference; and the rules of evidence should be the same, as applicable to both of these master passions. If it be allowable to ask, as in the case of *McKee and Nelson,* whether, in the opinion of the witness, the parties were not attached to each other, it would seem to justify the inquiry, whether the circumstances which surrounded the accused, were not sufficient to excite the fears of a reasonable man? The defendant, however, is required to act upon his own judgment, and not that of another, and is responsible to the law for the soundness of his conclusion. And foreseeing, as we do, the indefinite multiplication of collateral issues to which any other doctrine would lead, we affirm the judgment of the Court below upon this ground.

[4.] The place where Reese was killed, was a brothel of notoriety in the city, and Counsel for prisoner proposed asking the witness, Prater, "whether he was acquainted with the general character of deceased for violence in the place where the difficulty occurred?" And, "what was the character of deceased for violence in that particular place?" Objection was made to each of these questions by Counsel for the State, and the Court refused to allow them to be asked. To which ruling the prisoner, by his Counsel, excepted. And this constitutes the *fourth* error assigned.

No authority was read, for or against this point, except the case of *Boswell and Blackwell,* (12 *Ga. R.*) and that establishes this principle only: that where a witness is sought to

Keener *vs.* The State.

be impeached, and is shown to have a general reputation for truth and veracity in the *county* of his residence, that that may be considered, the *neighborhood* in which he lives, for the purpose of satisfying the demands of the law.

I took occasion, when delivering the opinion in this case, to state, that for myself, I was inclined to hold that the rejection of the questions, in the form in which they were put, was error; but that in deference to the opinion of my brother STARNES, as well as to that of the learned Judge who presided at the trial, I was content to affirm the judgment, with this distinct explanation: that it was competent to give proof as to the general conduct of the deceased for violence at this place—especially toward Keener—the testimony showing that they had long been rivals for the favor of the keeper of the brothel.

Upon examination, I am satisfied that the questions propounded to Prater, were in the proper form.

Mr. *Greenleaf*, in treating of the rule as to the admissibility of evidence of general character, concludes thus: " But it seems that the character of the party, in regard to any particular trait, is not in issue, *unless it be the trait charged against him;* and of this, it is only evidence of *general reputation* which is to be admitted, and not positive evidence of general bad *conduct.* . And the author quotes *Swift's Evidence,* and numerous cases, English and American, to sustain this proposition. (1 *Greenleaf's Evidence,* §55—*note.*) The particular trait involved in the issue here, was the character of Mr. Reese for violence in this place; a circumstance relied on by Keener, in part, for his justification in committing the homicide. And it would seem that the character of the deceased for violence, was to be established by general reputation, rather than positive evidence of general bad conduct.

Either mode of proof will be satisfactory to the defendant's Counsel, in the present case, provided we repudiate the doctrine, as we distinctly do, that a man may not have different general characters, adapted to different circumstances and localities; that is, a character for rail cars and a character for the brothel; a character for the church and one for the

street; a character when drunk, and a character when sober. Instead of a doctrine like this being too loose for judicial investigation, we hold that it is in accordance with the soundest elementary principles. In *all cases* where evidence is admitted, touching the general character of the party, it ought, manifestly, say the authorities, to bear reference to the nature of the charge against him.

A schoolmaster is indicted for an assault and battery upon one of his pupils; he defends himself under his acknowledged right to inflict moderate correction. The charge puts in issue the character of the teacher for violence; and where, pray, would you go, to ascertain that character? among his fellow-men, or in the schoolroom? There can be but one response to this question: an officer in the army or navy is tried for cruelty to a soldier or sailor; what has his reputation in the community, generally, to do with the trait of character involved in the issue? It is in the barracks, and on board the Man of War, that we look for what we wish to learn. There are thousands of men in this country, mild as a May-morning when sober, but demoniacs when drunk; have not such two distinct characters? Their moral identity is completely lost—their individuality metamorphosed under the maddening effects of alcohol. Philip drunk and Philip sober, were altogether different persons. As a conductor, Mr. Reese was uniformly gentlemanly; at the brothel, he was menacing, turbulent, rash, reckless and raging.

The case of *Quesenbury vs. The State*, (3 *Stewart & Porter*, 308,) although not strictly applicable to the precise point which we have been considering is, nevertheless, so pertinent to the case, that I am induced to make the following quotation from the opening of the Court, as delivered of Chief Justice *Lipscombe*: "that the good or bad character of the deceased, as an abstract proposition, can have no influence on the guilt of the accused, is too clear to admit of controversy. To murder the vilest and most profligate of the human race, is as much a crime as if he had been the best, most virtuous, and the greatest benefactor of mankind;

but there can be no doubt but that when the killing has been under such circumstances as to create a doubt as to the character of the offence committed, that the general character of the accused, may, sometimes, afford a clue by which the devious ways by which human action is influenced, may be threaded and the truth obtained. It is an acknowledged principle, that if, at the time the deadly· blow was inflicted, the person who so inflicts has well-founded reasons to believe himself in imminent peril, without having, by his fault, produced the exigency, that such killing will not be murder."

" If the deceased was known to be quick and deadly in his revenge of imagined insults ; that he was ready to raise·a deadly weapon on every slight provocation; or in the language of the Counsel, his " garments were stained with many murders," *when the slayer had been menaced* by *such* an *one*, he would find some excuse in one of the strongest impulses of our nature, in anticipating the purposes of his antagonist; the language of the law in such a case would be, obey that impulse to self-preservation, even at the hazard of the life of your adversary."

" If the killing took place under circumstances that could afford the slayer no reasonable grounds to believe himself in peril, he could derive no advantage from the general character of the deceased for turbulence and revenge ; but if the circumstances of the killing were such as to leave *any doubt*, whether he had not been more actuated by the principle of self-preservation than that of malice, it would be proper to admit *any testimony* calculated to illustrate to the Jury the motive of which he had been actuated."

" To this cause, we can see no good objection ; and it seems pretty certain, that it would often shelter the innocent from the influence of that sound, but not unfrequently severe maxim of law, that when the killing has been proven, malice will be presumed, unless explained and rebutted. There can be but little danger of the guilty escaping, under the influence of a prejudice created by such testimony against the deceased. The discretion of the Judge will be able to control and pre-

Keener *vs.* The State.

vent such a result.    And Jurors will be able to comprehend the reason and object of such proof."

[5.] The next error complained of is, that the Court withdrew and excluded from the Jury all the testimony of James Cosby.    This witness testified, that on Friday night before the death of Reese, which was on the Sunday evening he met Reese at the United States Hotel, who remarked to witness, that he had not seen him on McIntosh street for a good while.. Cosby replied, that he had not been there for about ten months.    Reese then said, that he, himself, did not go there as frequently as he used to do; that Keener had taken his woman from him; and he said that Keener was a damned coward, and that he had made him leave there two or three times; and that if Keener crossed his path he would kill him.. He added, he was going out there before long, and would' kick up hell.    Nothing more was said.

The testimony of Cosby was rejected, mainly upon the ground, that the threats which it proves, were made in a private conversation between Reese and witness, which was never communicated to Keener.

Without stopping to inquire whether the facts related by the witness, apart from the threats, were not admissible, we prefer to confront the question directly; and to consider whether or not the evidence of Cosby, taken as a whole, should not have been received ?    Keener is indicted for killing Reese; his defence is, that Reese manifestly intended, by surprise or violence, to take his life, or do him some bodily hurt; that the circumstances were such as to excite the fears of a reasonable man; and that he acted under the influence of those fears, and not in the spirit of revenge.    The proof is, that two nights before the tragedy occurred, Reese entertained the most deadly hostility toward Keener.    Jealousy, another name for insanity, of the most malignant character, had taken possession of his bosom, and was shaking the throne of his reason to its very foundation.    *Keener had taken his woman from him;* and if the damned coward ever crossed his path, he would kill him; he was going out on McIntosh street be--

fore long, and would kick up hell there. Prophetic words! He sowed to the wind, and reaped the whirlwind. What a terrible lesson! Well might the wise man say of the house of the strange woman—" *the dead are there!*"

Ought not this conversation, whether communicated to Keener or not, to have been admitted as a substantive fact, to show the *malus animus,* or evil intent toward Keener, with which Reese went to that house that night? Laying aside all technical rules and reasoning, we ask, with the knowledge of the mind and feelings of the deceased disclosed by this witness, would we not, and ought not the Jury, to listen more indulgently to the alleged apprehension of injury on the part of Keener? as well as to the facts and circumstances upon which he relies, to justify his conduct? Do not these previous threats throw light upon Reese's conduct, up to the time of the killing? Do they not serve to illustrate the transaction?

It is stated by Mr. *Starkie,* (1 *Treatise on Ev.* p. 39,) *Mr. Roscoe,* (*Ev.* p. 74, *& Seq.*) and all the writers on evidence, that the general rule is, that *all* the circumstances of a transaction may be submitted to the Jury, provided they afford any fair presumption or inference as to the matter in issue. This proposition is exceedingly broad, and if carried out in good faith, would produce the most beneficial results. Accordingly, in *Richardson vs. Royalton & Woodstock Turnpike Co.* (6 *Vermt.* 496,) and *Davis vs. Calvert,* (5 *Gill. & Johnston,* 269,) it was held, that all facts upon which any reasonable presumption or inference can be founded, as to the truth or falsity of the issue, are admissible in evidence.

In addition to the precedents quoted by Mr. *Roscoe,* to sustain the general rule of evidence above stated, we beg leave to refer to a few cases in illustration of the rule.

The case from Vermont was this : An action was brought by the plaintiff for damages occasioned on account of the insufficiency of defendant's bridge—so that in passing with a drove of cattle, some eighteen or twenty were precipitated

into the river, and seven of these were so much bruised and' wounded as to make it necessary to kill them. It was shown that the reach of the bridge which fell in had been erected' about three years before the accident happened. The plain-- tiffs further offered to prove, that in 1831, the defendants built the two northern reaches of the said bridge anew, as the · old ones had stood about nine years ; and that the new reach-- es thus erected, were stronger than the reach which fell in with the cattle. To the admission of this evidence, the Coun- sel of defendants objected. But the objection was over-ruled' and the evidence admitted, as having a tendency to show that the defendants considered that the augmentation of business,-- and the necessities of the community, required a stronger· bridge than the one first erected. The Court admit that the testimony is not very important, but that in modern practice, the evidence that is admitted to go to the Jury is more nat- ural, and not governed by rules so artificial as formerly.. "Under the rule, then," says the Judge, referring to that ta- ken from *Starkie,* "did the evidence afford any reasonable· inference, that the southern reach of the bridge, which broke, was insufficient, because in 1831 the defendants built the two· northern reaches stronger than the reach that did break? Does it tend to confirm the plaintiff's testimony, or weaken.· or contradict the defendants?" ·

In *Caldwell against The State of Connecticut,* (17 *Conn.* *R.* 467,) it was decided, that where an information for keep- ing a house of ill-fame, charged the offence as having been committed *after* the Statute prohibiting it, went into opera-- tion, and evidence was offered to prove that the house was re-- puted to be of ill-fame *previous* to that time, that such evi- dence was admissible as conducing to prove that it sustained'. the same reputation afterwards.

*The State vs. Goodrich,* (19 *Vermt. R.* (4 *Washburn,*) 116,) is almost identical with the case under discussion. Goodrich· was indicted for discharging a gun at one Green and wound- ing him ; and the person injured was a witness on the trial ; and it appeared that the affray took place on the premises of'

the defendant.   Goodrich insisted that the assault and bat-
tery, if committed by him, was in defence of his person or
property, and offered evidence to prove that there had, at
previous times, been fights between Green and himself; and
that his house had been attacked, and his property, by a com-
pany, of which Green was one; and that Green had fre-
quently threatened violence upon his person.   The Court de-
cided that it was not competent, as a defence to this prosecu-
tion, to inquire into the previous affrays and contentions be-
tween the parties; or to prove a previous threat by Green,
that he wanted to get some powder for the purpose of blow-
ing up the house of the defendant.

*Redfield,* Justice, in delivering the opinion of the Supreme
Court, stated the question to be, whether Green made the
first assault, or whether Goodrich acted in self-defence.   And
after stating that it is not always easy to determine what is
collateral to the main issue, the Judge proceeds—" In the
present case, if it was material to know with what *intent*
Green went to defendant's house, that could only be shown
by his acts and his declarations, in connection with those
acts.   As part of that *intent,* it might have been shown that
he declared his intention to see if the hay remained; and we
apprehend what is stated in the bill of exceptions, in regard
to the tendency of the testimony on the part of the State, to show
that he went there *with that intent,* must have been derived, part-
ly at least, from his declarations on the way and while there.
That is the only way it could be shown, aside from his own
testimony.   And we think that all his declarations, from the
time of setting out on his expedition, in connection with his
acts, are competent to show *with what intent he went there.*
And if an innocent intent may be shown in this way, then the
contrary may also be shown in the same manner.   And in
this view, the evidence was in no sense collateral."

" If Green, then, denied making such a declaration, it
might be shown that he, in fact, did both as tending to im-
peach the witness by contradicting him; *and as going to
establish the fact that he went there for the purpose of begin-*

*ning an affray, and as tending to justify, perhaps, more vigorous defence of any supposed offensive movement on the part of Green."*

[6.] The true distinction, we apprehend, as to the admissibility of evidence of threats, and one apparently overlooked in many of the cases, is this: when sought to be introduced by the defendant as a justification for the homicide, and without any overt act, he must show that they have been communicated; otherwise they can furnish no excuse for his conduct; but when offered to prove a substantive fact, namely: the state of feeling entertained by deceased toward the accused, it is competent testimony, whether a knowledge of the threats be brought home to the defendant or not.

[7.] I will merely add, that the remoteness or nearness of time, as to threats and declarations, pointing to the act subsequently committed, makes no difference as to the competency of the testimony. (3 *Strobhart's L. R.* 517, *note.*)

Upon the authority of the note, then, as laid down by Mr. Starkie and others, and as illustrated by numerous adjudicated cases, we are clear that the testimony of Cosby should have been admitted, as it conduced to prove, in connection with other evidence, the *quo animo* with which Reese resorted to the brothel on McIntosh street that night; and that his manner and conduct corresponded with that purpose, so as to warrant Keener in believing that the same scenes were to be repeated there that night, which had been re-enacted several times before; and that no alternative would be left, but to retreat again as he had done before, twice or three times, or take the consequences.

In view then, of the frequent failure of justice, from the failure of evidence—and thoroughly convinced, as we are, that no competent means of ascertaining the truth ought to be neglected, we think the testimony of James Cosby was improperly ruled out. It was pertinent to the issue, and ought to have been submitted to the Jury. It showed the intent with which Reese resorted to this brothel; and, also, his feelings toward the defendant.

[8.] We propose to consider and dispose of the 6th, 7th, 8th and 9th assignments of error together. They present, for our review, the main questions in this case; all the rest are comparatively of minor importance.

In his charge to the Jury, the Court, in the language of the bill of exceptions: "failed, omitted and declined, although requested by the Counsel for the prisoner so to do, to read to the Jury or comment upon the 12th and 13th sections of the 4th division of the Penal Code, upon which Counsel for prisoner had mainly relied for his defence. The Court having read the 1st, 2d, 3d, 4th, 6th and 7th sections, then charged the Jury that the section of the Penal Code, applicable to the grounds on which the defence had been placed, was as follows: reading the 15th section; to which failure, omission and refusal to charge, and charge as given, Counsel for prisoner excepted."

"The Court was also requested, by Counsel for prisoner, to charge the Jury as follows:

1st. That if they believed, from the evidence, that the prisoner, at the time of the commission of the act, was under the fears of a reasonable man, that the deceased was manifestly intending to commit a personal injury upon him—amounting to felony, the killing was justifiable homicide.

2dly. That if they believed, from the evidence, that the prisoner was under similar fears of some act of violence and injury, less than a felony, his offence was manslaughter, and not murder."

"Which charge, so requested, the Court failed and refused to give; to which failure and refusal, Counsel for the prisoner excepted." It is also assigned as error, that the Court failed and omitted to read to the Jury and comment upon the 9th, 10th and 11th, as well as the 12th and 13th sections of the 4th division of the Penal Code, although requested by Counsel so to do.

I would remark, that by reference to the bill of exceptions, I do not find that any request was made of the Court to give in charge and expound to the Jury the 9th, 10th and 11th

sections of the 4th division of the Code. . These three sections relate exclusively to involuntary manslaughter; and there is not a particle of proof to make this killing that offence.   It was murder, voluntary manslaughter or justifiable homicide.   The Court was right, therefore, in pretermitting that portion of the Code which defines, with its sub-division, involuntary manslaughter, and annexes a penalty to each grade of the offence.   Counsel for prisoner do not pretend that this law is applicable to his case.   To give it in charge to the Jury, then, would be to distract and burden their minds, unnecessarily and improperly.   Whether or not there was error in the remainder of these assignments, depends upon the fact of whether there was *any evidence* upon which the Jury might have mitigated the offence from murder to a lower grade of homicide.   We go one step further: If the cirstances of the killing were such as to leave any doubt whether Keener had not been actuated by the principle of self-preservation, rather than that of malice, we shall be constrained to remand this cause for a new trial.   For the question, whether Keener killed Reese to prevent Reese from killing or doing him some great bodily harm, has not, in the opinion of this Court, been fully submitted to the Jury.   A part of the law only, applicable to the defence, was given; and where a man's life is at stake, it is fit and proper to allow him the benefit of every provision of the Code.

[9.] In every charge of crime, there must be a question of law, and a question of fact.   Is there any such rule of law as that on which the indictment is founded ?   Has the defendant violated that rule ?   The decision of both of these is necessarily involved in the general verdict of " guilty" or " not guilty"—the only form of verdict allowed by our Code.   The former finding affirms both the existence of the law and its violation by the accused ; the latter, either that there is no such law, or that it has not been transgressed.   It is the duty of the Judge to declare to the Jury what the law is, with its exceptions and qualifications ; and then to state hypothetically, that if certain facts, which constitute the offence, are

proved to their satisfaction, they will find the defendant guilty; otherwise, they will acquit him.

In this State—in all free governments—in tenderness to the accused, great latitude has been allowed to Counsel in stating and enforcing their views of the law in criminal cases. And a liberal confidence has been reposed in those who are called to defend the liberty and life of the citizen in the hour of trial. And where Counsel, in their place, under their professional obligations to the Court and the country, insist that certain portions of the law apply to the facts of their client's case; especially where it is *capital*, it would be better to read the law to the Jury, with such comments and explanations as the Court, possessing the superintending power, might feel it to be its duty to give.

The theory of our system is, that the Jury have not only the power, but the right, to pass upon the law, as well as the facts, in rendering their verdict; and yet, this anomaly stares us in the face, that they are not permitted even to take the Code to their consultation room. They know nothing of the law, except so much and such parts of it as are given them in charge by the Court. This fact alone, is strongly suggestive of the propriety of withholding no law from them, which they are entitled to consider. Suppose, as in the present case, it were doubtful whether this offence, as proven by the witnesses, came under the 12th and 13th sections of the 4th division of the Penal Code, as contended for by the defendant's Counsel, or under the 15th section, according to the opinion of the presiding Judge, should not both have been submitted?

In *Case's English Liberties; or, The Freeborn Subject's Inheritance*, 201–'2, it is said, "the office and power of Juries in criminal cases, is judicial; from their verdict there lies no appeal; by finding guilty or not guilty, they do complicately resolve both law and fact." And that in a criminal trial, the Jury may determine the law and the fact of the case, has been supported by every English Judge, except Chief Justice *Jeffries*, in the case of *Col. Sidney*, (3 *Har-*

*grave's State Trials*, 805.) And to their credit be it spoken, that the Juries have always been right on fundamental questions of liberty and popular right. (1 *Chandler's Crim. Trials*, 143, 149, 153, 269, 288. *Yenger's Case*, 17 *Howell's State Trials*, 675, 724.)

But how can they judge of law which is not before them? There is no alternative—either the Courts must refer to the Jury the whole law of the case, or the supposed distinction between the power of Juries in civil and criminal cases, should be abolished.

[10.] With these preliminary remarks, we proceed to examine the 12th, 13th and 15th sections of the 4th division of the Penal Code.

By the 12th section, it is enacted, that "there being no rational distinction between excusable and justifiable homicide, it shall no longer exist. Justifiable homicide is the killing of a human being by commandment of the law, in execution of public justice; by permission of the law, in advancement of public justice; in self-defence, or in defence of habitation, property or person, against one who manifestly intends or endeavors, by violence or surprise, to commit a felony on either; or against any persons who manifestly intend and endeavor, in a riotous or tumultuous manner, to enter the habitation of another, for the purpose of assaulting or offering personal violence to any person dwelling or being therein." (*Cobb's Digest*, 784.)

Section 13th, declares that a bare fear of any of those offences, to prevent which the homicide is alleged to have been committed, shall not be sufficient to justify the killing; it must appear that the circumstances were sufficient to excite the fears of a reasonable man; and that the party killing really acted under the influence of those fears, and not in the spirit of revenge." (*Ib.*)

Section 15th, provides that, "if a person kill another in his defence, it must appear that the danger was so urgent and pressing, at the time of the killing, that, in order to save his own life, the killing of the other was absolutely necessary;

and it must appear, also, that the person killed was the as-sailant, or that the slayer had really and in good faith, endeavored to decline any further struggle before the mortal blow was given." (*Ib. p.* 785.)

It is clear that there is no conflict between these different sections. The last two sections may be construed, perhaps, to be qualifications of the first. The right of self-defence is given by the 12th section, against one who manifestly intends to commit a felony, by violence or surprise, on the person or property of another. Section 13th limits this right, by requiring that the circumstances, to justify the killing, must be sufficient to excite the fears of a reasonable man; and that the party killing, really acted under the influence of these fears, and not in the spirit of revenge ; and the 15th section still further restricts the right, by providing that the danger should be so urgent and pressing, at the time of the killing, that in order to save his own life the killing of the other was absolutely necessary.

Either this is the true exposition of the three sections taken together, and they should not, therefore, be separated; or else the 15th section applies to a different class of cases than the one contemplated in the 12th; and we are not prepared to say that the latter would not be the sounder interpretation.

Was there any evidence, then, which entitled the defendant to have the 12th and 13th sections given in charge by the Court to the Jury ?

It is in proof, that Reese went to the house of Yarborough, the night on which he was killed, with his bosom boiling with hate toward Keener, and breathing forth threats of revenge, should he encounter him. He finds him in the bed-room of the miserable mistress of the brothel ; he kicked furiously at the door ; he jobbed at the window with his knife, the blade of which was six inches long; he called out to Jane Yarborough : "show up your Keener, I want to cut his damned throat." Keener dresses and comes out upon the piazza,

armed with a cane and pistol; Reese walked out on the piazza and asked for a pistol; he then seated himself on the bench with folded arms. Reese called Keener "a damned, cowardly, pusillanimous son of a bitch;" Keener asked him to repeat it; he did so; daring Keener to point his pistol at him, making, at the same time, a motion with his arm; Keener fired and Reese fell; he was shot in the abdomen; and from: the direction of the balls, Reese must have been in a rising attitude or sitting and bending over, when the wound was received.

We ask not whether this proof is sufficient to justify Keener in killing Reese, or even to reduce the homicide to manslaughter. That is not the question. Is there *no evidence* which *tends to show* that Reese intended, by surprise or violence, to commit a felony upon the person of Keener? or, at any rate, that the circumstances were sufficient to excite the fears of a reasonable man, that such was the intention of Reese?

Without expressing or intimating the slightest opinion as to the sufficiency of the testimony, we are unanimously of the opinion that the facts which have been detailed, in connection with others in the record, were such as to have entitled the accused to the consideration, by the Jury, of the law upon which he rested his defence; and consequently, that it was error in the Court to refuse to give this law in charge to the Jury, when requested to do so by prisoner's Counsel.

The presiding Judge instructed the Jury, very properly, to inquire whether the homicide was murder, voluntary manslaughter, or done in self-defence; and read to the Jury the law defining each; and assigned, as a reason, the facts disclosed by Emma Burns and Dr. Felder. Why was not *all the law* respecting voluntary manslaughter and justifiable homicide given in charge? How could it be said that there was evidence to authorize the reading of the 15th section, but none which was applicable to the 12th and 13th sections; and that, too, when it is admitted that stronger proof is necessary to acquit under the 15th, than under the 12th and 13th sections? If the evidence referred to by the Court

*tended* to establish the defence of the prisoner, under the 15th section—(and if it did not, why was it read ?)—why did it not likewise *tend* to the same purpose, under the 12th and 13th sections ?   The Jury who were sworn to try this traverse, had a right to find their verdict upon their own convictions and consciences: for as was very pertinently said by Chief Justice *Vaughn* in *Bushell's case,* ( *Vaughn's R.* 148,) " A man cannot see by another's eye, nor hear by another's ear.   No more can a man conclude or infer the thing to be resolved by another's understanding or reasoning."   He continues— " Upon all general issues, as upon not culpable pleaded, the Jury find upon the issue to be tried, wherein they resolve both law and fact complicately, and not the fact itself; so as though they answer not simply to the question—what is the law ?  Yet, they determine the law in all matters where issue is joined and tried."   (*Ib.* 150.)

Said Chief Justice *Parsons,* in *Coffin vs. Coffin,* (4 *Mass. R.* 25,) " the issue involves both law and fact; and the Jury must decide the law and fact.   To enable them to settle the fact, they must weigh the testimony ; that they may truly decide the law, they are entitled to the assistance of the Judge."   How to the " assistance ?"   By withholding from them the law upon. which the prisoner professedly grounds his defence ?  No—nor by having it read, and then taking the law, implicitly and without questioning, from the Court ; otherwise, the verdict is not *theirs,* but in part only; and general verdicts should be abrogated, and special verdicts revived.   They should find the *naked* fact instead of the *criminal* fact.   It follows, demonstrably, then, under our Code, that to make a *whole* verdict—a *legal* verdict, the Jury must find the conclusion of *law* upon the *facts ;* and notwithstanding it is their privilege, as well as their duty, to receive " assistance" from the Court, still, the conclusion of *law* upon the facts, must be the result of their own conviction and understanding.

If the power thus committed to the Jury be exercised against the opinion of the Court to convict, the remedy is

with the Court to set aside the verdict and award a new trial. If used to acquit, it must be an extreme case; and although contrary to law, is rarely tainted with corruption. It is produced, generally, by a liberal interpretation of the law, in favor of liberty and life.

In connection with the topics already discussed, the Court was requested, by Counsel for the prisoner, to charge the Jury—

1st. That if they believed, from the evidence, that prisoner, at the time of the commission of the act, was under the fears of a reasonable man, that the deceased was manifestly intending to commit a personal injury upon him, amounting to felony, the killing was justifiable homicide.

This charge the Court refused to give. And wherefore? Is it not in exact accordance with the terms of the Code?

2dly. That if they believed, from the evidence, that prisoner was under similar fears of some act of violence and injury, less than a felony, his offence was manslaughter.

This request was likewise refused; and although not in the Code, in so many words, it would seem to be a necessary corollary from the sections we have been considering. Indeed, it is a familiar principle, and one scattered everywhere in works on criminal pleading. "Neither can a man," says *Hawkins*, "justify the killing another in defence of his house or goods, or even of his person, from a bare private trespass; and therefore, he that kills another who, claiming a title to his house, attempts to enter it by force or shoots at it, or that breaks open his windows in order to arrest him, or persists in breaking his hedges after he is forbidden, is guilty of *manslaughter*." (1 *Hawkins' Pleas of the Crown*, 372.)

The requests being legal and refused, the judgment complained of upon these points, must be reversed.

The 7th ground taken in the motion for a new trial, was because James Sikes, one of the Jurors sworn in chief, did not stand indifferent between the State and the prisoner, said Juror having, previously to being sworn, expressed decided opinions in relation to the guilt of the accused, and such strong

prejudice against the accused, as rendered him an incompetent Juror, in law, and which were unknown to the accused or his Counsel, until after the verdict was rendered, said Sikes having previously answered, negatively, the usual questions on the *voire dire.*

As this question cannot recur on the re-hearing of this cause, and no principle is involved in its adjudication, we forbear to consider it; our decision upon the whole case being, that the judgment of the Superior Court ought to be set aside and a new trial granted, which is ordered accordingly.