## The State v. Benham.

1. **Criminal law**: SELF-DEFENSE: PHYSICAL CAPACITY OF PARTIES, ETC. Where, in a prosecution for murder, it appeared that the defendant was a boy only sixteen years of age, that the deceased was a large and strong man, that they accidentally met and engaged in a dispute, in which the deceased became angry and threatened to "thrash" defendant, and advanced upon him for that purpose, with an ox-gad, when he was mortally wounded by the discharge of a gun in the hands of the defendant, it was *held*, that the physical capacity of the parties, the size and character of the ox-gad, the manner in which the deceased threatened to use it and in which he entered upon the execution of the threat, were important considera-

tions for the jury in determining the question whether defendant, in what he did, acted within the law of necessary self-defense, and that for this purpose the jury should have been instructed to consider these circumstances.

2. —— IMMINENT PERIL : INTENTION OF ASSAILANT. If all the circumstances show an intention on the part of an assailant to take the life of the assailed, or to do him some enormous bodily injury, then the person assailed may lawfully take the life of his assailant, provided he uses all the means in his power, otherwise, to save his own life or prevent the threatened harm ; such as retreating, if the assault be not so sudden, fierce and dangerous as to render retreat unsafe, or if retreat is not practicable, then by disabling, instead of killing his adversary, if it is within his power to simply disable him.

3. —— WHEN THE PERIL IS NOT IMMINENT. But if the person assailed had no reasonable ground to believe that he was in danger of death or great bodily injury, but on the contrary that his assailant only intended a simple or ordinary non-felonious assault, simply intended to chastise or whip him, then the person assailed would not be justified in taking the life of his assailant.

4. —— WHERE DEFENDANT SEEKS THE QUARREL. Nor can a defendant justify his act under the plea of self-defense, if he sought the deceased with a view to provoke a difficulty or bring on a quarrel.

5. —— ENORMOUS BODILY INJURY. Where, in a prosecution for murder, the court instructed the jury, that in order to make out self-defense, the taking of the life of the deceased must have seemed to the defendant reasonably necessary to save his own life, the charge was held to be erroneous, because it omitted to give the defendant the benefit of the plea of self-defense if he took his assailant's life to save himself from imminent and enormous bodily injury.

6. —— INSTRUCTION TENDING TO MISLEAD. When an instruction relating to the law of self-defense, is so drawn, that when applied to the particular facts of the case, it might mislead the jury, it will be held erroneous.

7. —— ACCIDENTAL KILLING : EXCUSABLE AND NON-EXCUSABLE HOMICIDE. The accidental killing of another, when done in the prosecution of an unlawful act, is not excusable homicide ; but if one doing a lawful act, and using proper precaution to prevent danger, accidentally kills another, the law excuses the killing.

8. —— APPLICATION OF THE RULE. If one point a loaded gun at at another under circumstances which would not justify him in shooting the latter, who seizes it and struggles for it to save himself

from the menaced injury, and in the struggle the gun is accidentally discharged, causing the death of the person at whom it was pointed, the other cannot claim that the homicide was justifiable. *Aliter*, if he had pointed the gun at the deceased, and it "went off" under circumstances in which it would have been lawful for him to have discharged it in self-defense.

*Appeal from Franklin District Court.*

WEDNESDAY, JULY 31.

MANSLAUGHTER : SELF-DEFENSE : DEATH BY ACCIDENT : WHEN JUSTIFIABLE, ETC. — The indictment charges the defendant with the murder, on the 11th day of October, 1866, of one Z. T. Shepard.

Plea — not guilty. Verdict — guilty of manslaughter. Judgment — fine, and four years imprisonment in the penitentiary. The case is somewhat peculiar, and is so largely influenced in its determination by its special circumstances that it is necessary briefly to state these.

The deceased (Shepard) came to his death by a shot received on the 11th day of October, 1866, in the leg, near the groin. The shots taken from the wound by the surgeon " were of small size, such as are used for shooting birds." Shepard lived six days after the wound was inflicted. He was conscious of its fatal character from a period very soon after it was received. During this period he made two different statements, which were received as *dying declarations*, in relation to the manner in which he was wounded. One of these statements was given in evidence by the State, the dying declarations being testified to by Mrs. Shepard, widow of deceased. The other of these statements, was made to Mrs. Hunt, she being introduced as a witness by and in behalf of the defendant. Mr. Hunt, her husband, heard the same statement testified to by his wife, and gave testimony substantially the same as his wife.

The only evidence inculpating the defendant, are these dying declarations. Concerning these dying declarations, there is some substantial difference between the testimony of Mrs. Shepard, on the one hand, and Mrs. Hunt (supported by her husband), on the other. The statements made by the deceased, and given in evidence, respectively, by Mrs. Shepard and Mrs. Hunt, relate to different times : that is, these witnesses are not referring to the same conversation. Before giving the substance of these different statements it is proper to allude to some other facts in relation to which there is but little, if any, dispute.

It was shown that the defendant was just one month over 16 years of age, weight and size not appearing in the record. He was living with his father.

The deceased, it was testified, "was about 5 feet 10 inches high, weighing not quite 170 pounds, was about 30 years of age, a good, stout, able man, as much so as any man in the county, slow temperament, slow to talk, not much to say, but when he spoke meant it, did not often get angry, but high tempered when mad."

The farm of the deceased is upon one side of a creek, that of the defendant's father, on the other. The creek is about one rod in width and from two to three feet deep. On the day deceased was shot, he was at the ford of the creek with an ox-team loading sand.

The following is the substantial portion of the dying declarations given in evidence by Mrs. Shepard :

He (Shepard) told me he was at creek loading sand. Benham (the defendant) came on opposite side with gun ; Benham commenced on him about cattle ; they had a few words, Benham said cattle were troubling him, and if they continued he would dog them. Shepard told him to dog them as much as he chose, but not to cross the creek and drive them off with a horse. Benham told him (Shepard)

that he (Shepard) had shot cattle and now it was his (Benham's) turn. Shepard told Benham he had shot no cattle; if he told him so again he would whip him. Benham repeated that he had shot cattle, and *he* would shoot too, and Shepard started across the creek toward him; as he was almost across the creek, Benham met him with his gun and pointed it at his (S.'s) breast. Shepard sprung out of the water, took hold of the gun to push it down, and it was discharged into his thigh.

Shepard said he held on to the gun as long as he was able; asked Benham to help him across the creek; Benham would not; asked him to take care of oxen so they would not break the wagon; Benham would not; asked B. if he would shoot again if he would let go the gun; B. said he would not; he let go the gun; B. put the gun on his shoulder and ran off; said he never struck B.; Shepard said he did not tell B. what he would whip him (B.) with; that he had a stick in his hand; that it was a willow he was driving cattle with; went over with the stick; said he did not strike B.; " did not lay the weight of his hand on him " (as stated to Mrs. Dillingham).

Mrs. Hunt testified that the deceased told her " that he should die, etc. ; that he went to the creek after some sand; Benham came along; Shepard told Benham not to run off his cattle as he had been doing; Benham said he had as much right to run off his cattle as he had to shoot other's cattle; Shepard told him if he told him that again he would go over and thrash him; B. said he (S.) had shot cattle, and he could prove it; Shepard said he was so mad that he plunged into the creek with the intention, as he told B., twice, to give him a G— d—d thrashing; as he came to the shore, B. told him to stand back; when he came up he took hold of the gun, and while he had hold of it the gun went off; he thought B. might have helped him home."

Mr. Hunt's evidence is substantially the same. He represents Shepard as stating that he (Shepard) first halloed over to B. about the cattle; that when B. reiterated the charge that S. had shot cattle, that S. said "he bounced into the creek as quick as he could; swore he would give him a G— d—d thrashing; B. told him to keep back; B. pushed him back with the gun, when he grasped the gun with both hands; S. pulled one way, B. the other, when the gun went off; said he did not know how the gun went off, only it went off in the struggle; said nothing about asking B. to help him or the oxen, or about his running off.

Defendant produced a witness (Dodd) who testified, "that on the day of the shooting, he heard B.'s father send him to drive away cattle, heard bells; B. was gone about an hour; suppose he took gun to drive cattle."

It was testified by a witness (Davis) that the "ox-gad used by the deceased on the day he was shot, was about six or seven feet long, three-quarters of an inch thick; think it was elm, not peeled; I saw it; it was about an inch thick at the butt; it was green."

The above is the substance of all of the material evidence in the case.

Defendant appeals. The questions made and decided appear in the opinion of the court.

*E. W. Eastman* for the appellant.

*Henry O'Connor*, Attorney-General (with whom *J. H. Bradley*, district attorney), for the State.

DILLON, J.—It is not denied that the fatal meeting

1. CRIMINAL LAW: self-defense: physical capacity of parties, etc.

between the deceased and defendant took place at the creek, and on the day named in the indictment. *How much* the dying declarations establish, is the principal question arising upon the evidence.

The deceased, at no time, charged the defendant with having purposely discharged the gun at him. He complained of his conduct in other respects, such as refusing to assist him; but upon repeated examinations of the evidence, we do not discover that he even stated that the defendant intentionally shot him. Had he so believed, he would most likely have so declared.

There is no reason to question, upon the evidence as it stands, that the meeting at the creek between Shepard and young Benham was accidental. Shepard was there hauling sand, and Benham happened along with his gun, having been sent out to drive away the cattle. Whether the cattle were in view at the time the gun went off, does not appear.

On the merits, the defense must rest upon one of two grounds.

1. That the fatal shot was given in necessary self-defense. This assumes that it was intentional, but justified from necessity.

2. That it was purely accidental, and under circumstances to which the law will ascribe no guilt.

Which of the two commenced the altercation or dispute about the cattle is not clear. But it is clear, from the testimony of the wife and the Hunts, that the deceased made the first threat of an assault; that he either had in his hand, or what is more probable, as he was loading sand, took up the ox-gad, with which to execute the threat; that he was so angry that he plunged into the stream, threatening to thrash the boy, and that he crossed it for this purpose.

So far, there is no dispute. Now, it is to be recollected, that the deceased was a large and strong man, weighing about one hundred and seventy pounds, and the defendant a boy of sixteen years of age. It is probable, that, physically, the deceased was much the superior of the boy.

The physical capacity of the two persons would be an important consideration for the jury in determining the question, whether the defendant, in what he did, was within the law of necessary self defense. So, the size and character of the ox-gad or weapon which the deceased seized or had, the manner in which he threatened to use it, and in which he entered upon the execution of that threat would also be important considerations for the jury.

Now, none of these circumstances are in any manner alluded to in the charge of the court. The attention of the jury should have been called to these circumstances, that is to say, to the nature and character of the advance of the deceased upon the defendant.

And the jury should have been directed to ascertain whether all the circumstances in evidence denoted or showed an intention on the part of Shepard to take the life of Benham, or to do him some enormous, some dreadful bodily harm; if they did, then Benham, in self-defense, might lawfully take the life of his assailant, provided he used all the means in his power, otherwise, to save his own life, or prevent the intended harm, such as *retreating*, if the assault was not so sudden, fierce and dangerous as to render retreat unsafe, or if retreat were not practicable, then, by *disabling* his adversary, instead of killing him, if it were within his power simply to disable him.

*2. —— immi-nent peril: intention of assailant.*

And to make the above more plain to the jury, it would be well to add, that if the defendant had no reasonable ground to believe that he was in danger of death or great bodily harm, but had reasonable ground to believe that the deceased only intended a simple or ordinary non-felonious assault, simply intended to chastise or whip him, this would not justify the defendant in resorting to the extreme measure of taking the life of his assailant; and if, under such circumstances, the

*3. —— when the peril is not imminent.*

defendant intentionally fired the gun, he would be guilty of, at least, manslaughter. Nor would defendant be justified by the laws of the land in shooting at another, if he had no reason to suppose himself in danger of death or enormous bodily harm, merely because it might be regarded as disgraceful or dishonorable not to stand his ground.

Nor can the defendant get the benefit of the plea of self-defense, if he sought the deceased with a view to provoke a difficulty or to bring on a quarrel. *State* v. *Neely*, 20 Iowa, 108.

*4. —— where defendant seeks the quarrel.*

The law regards human life as the most sacred of all interests committed to its protection, and there can be no successful setting up of self-defense, unless the necessity for taking life is actual, present, urgent, unless in a word, the taking of his adversary's life is the only reasonable resort of the party to save his own life, or his person from dreadful harm, or severe calamity, felonious in its character. *State* v. *Thompson*, 9 Iowa, 188, 20 Id. 569.

In the main, the charge of the court was very correct, but it was defective in the particular above suggested; it was not closely enough applicable to the case.

The case was very peculiar, and we may add, in view of the evidence, not a little difficult. There was special necessity for great care in the instructions to the jury. In addition to omitting to allude to the respective sizes and ages of the defendant and deceased, the character of the weapon used by the deceased, and the nature of the advance or assault by the deceased, the charge of the court, was, in one or more instances, erroneous or calculated to mislead the jury.

Thus, in the eighth instruction the court charged that in order to make out self-defense the taking of the life of the deceased must have seemed to the defendant, reasonably necessary to save his own life;

*5. —— enormous bodily injury.*

thus omitting to give the defendant the benefit of the plea of self-defense if he took his assailant's life to save himself from imminent and enormous bodily injury, felonious in its character. See on this subject *State* v. *Kennedy*, 20 Iowa, 569; *State* v. *Thompson*, 9 Id. 188; *State* v. *Wells*, 1 Coxe (N. J.) 424; *State* v. *Decklotts*, 19 Iowa, 447; *State* v. *Neely*, 20 Iowa, 108.

Then, again, the twelfth instruction is quite faulty, especially in its application to the circumstances of the case. It contains this language: " Proof of angry words, actions or gestures, expressions of contempt without blows, without any assault, would not be sufficient to reduce the crime to manslaughter. But if the assault is made and death ensues to the party assaulting, and there is no evidence of deliberation, it would be manslaughter, and if the assault was violent, and the instrument or weapon used was a dangerous weapon, as a *loaded gun*, and such assault was under such circumstances as would lead a man of ordinary prudence to fear for his life, then, if death follows to the assailant, the killing would be justifiable."

6. —— instruction tending to mislead.

This instruction to have any application must refer to the assault of the deceased upon the defendant. But the deceased had no loaded gun. It was the defendant who had the gun. By the use of this illustration of a deadly weapon in the hands of an assailant, it would be very easy, if not natural, for the jury to construe this instruction as referring to an assault by the defendant with a loaded gun upon the deceased. Such a state of facts is just the reverse of the case before the jury.

If the jury should believe that the defendant discharged the gun intentionally, the above sufficiently refers to the legal principles upon which the plea of self defense must rest. But, suppose the jury shall believe that the gun was not

intentionally discharged by the defendant, what is then the law of the case? It is this: Accidental death, *wholly* to be excused from *all guilt*, must be caused in the doing of some *lawful act*.

The law, in its solicitous regard for human life, requires all reasonable and due caution in the use of dangerous articles or instruments. If one in doing a lawful act, without any intention of bodily harm, and using proper precaution to prevent danger, unfortunately happens to kill another, the law excuses the killing. Fost. 258; 1 East. P. C. ch. 5, § 40, p. 266; Id. ch. 5, §§ 8, 36; 1 Russell on Crimes, 657, 658; Whart. Cr. L. (2d ed.) 382, 385.

If, therefore, the defendant pointed a loaded gun at the deceased, under circumstances which would not have justified him in shooting the deceased, and the deceased seized it and struggled for it to save himself from the menaced injury from it, and in the struggle it went off without being purposely shot off by the defendant, the latter could not claim that the homicide was excusable. It would be manslaughter; and the circumstances relied on *wholly to excuse* the defendant, would be regarded by the court in affixing the amount of punishment.

8. —— application of the rule.

The converse of the last proposition would, of course, be true, viz.: that if the defendant pointed a loaded gun at the deceased and "it went off," under circumstances in which it would have been lawful to have shot it off, the defendant would be regarded by the law as being guilty of no offense.

It is not necessary to notice specially the other errors assigned.

The judgment of the District Court is reversed, and the cause remanded for trial *de novo*.*

Reversed.

---

* On a subsequent trial, the defendant was convicted of manslaughter.