WATKINS vs UNITED STATES.

Opinion delivered August 27, 1897.

*1.   Felony—Peremptory Challenges.*

In capital and other felony cases, the provisions of Sec. 2239 of
Mansfield's Digest, which allows the prosecution ten peremp-
tory challenges, are in force in the Indian Territory under Act
of Congress of March 1st, 1895, and not Sec. 819 of the Revised
Statutes, which allows the prosecution only five challenges.

*2.   Instructions—Homicide.*

In a prosecution for murder, where the defense was justifiable
homicide, the following instruction should have been given
when requested by defendant, and the refusal to give it was
erroneous:   "The jury are instructed that in order to justify
homicide upon the ground of self-defense, it is not necessary

that the party killing should have been in actual danger of los-ing his life or of receiving serious bodily injury at the hands of the person killed at the time of the homicide, but it is sufficient to justify the killing if the acts or words, coupled with the acts of the party killed, viewed from the defendant's standpoint, where such as to reasonably cause the party killing to apprehend that he was in apparent danger of losing his life or having serious bodily injury inflicted upon him by the party killed; he would be justified in killing his antagonist, and it is immaterial whether the danger was real or not, it being sufficient in law to justify homicide if it only be apparent."

*3. Instruction—Meaning Must be Clear.*

It is not sufficient to excuse the refusal to give a proper instruction that another instruction was given to substantially the same effect, unless the instruction given is plain, comprehensive, easily understood and free from doubt. It is not sufficient that to a mind trained to statutory construction it means the same.

*4. Instruction—Erroneous.*

The court charged the jury as follows: "In order to justify homicide on the ground of self defense it is not necessary that there should be an actual or real danger to the life or person of the party doing the killing, if there be an appearance of danger caused by the acts or demonstrations of the party killed, or by words coupled with the acts or demonstrations of such party, and if such acts or demonstrations or such words coupled with them, produced in the mind of the party slaying a reasonable expectation or fear of death or some serious bodily injury to himself, the party killing will be justified if he acts upon such appearance of danger and under such reasonable expectation or fear." *Held*, Erroneous, as there might be many facts known to the defendant which were not apparent to an eyewitness, which might cause the defendant to believe he was in danger, when from the acts, words and circumstances surrounding there might be no apparent danger to one not possessing this knowledge.

*5. Instruction—Erroneous.*

At the request of the prosecution, the court instructed the jury as follows: "The jury are instructed that a party can not

himself provoke a difficulty and then slay his adversary upon the ground of self-defense; so that if you find from the evidence in this case, beyond a reasonable doubt, that the defendant William R. Watkins himself provoked a difficulty with the deceased, he could not slay Wyatt Williams in self-defense unless he himself, after provoking the difficulty, withdrew from the same, in which event his right of self-defense would revive.'' *Held*, Under the facts in this case, this instruction was erroneous unless it was qualified by stating the facts which would support that contention, and it should have been followed by other instructions presenting fully and correctly the theory upon which the defendant relied for his defense.

6. *Homicide—Former Malice—Defense.*

When two persons have formerly fought on malice and are apparently reconciled, and fight again on another quarrel, it shall not be contended that they were moved by the old grudge unless it so appear from the circumstances of the affair.

7. *Instruction—Refusal not Erroneous.*

Defendant asked the following instruction, which was refused: "The jury are instructed that although the evidence may show that at some time previous to the killing of Wyatt Williams the defendant Bud Watkins had malice towards the deceased, yet if it further appears from the evidence that subsequently to such time the said malice on the part of the defendant was abandoned by him and friendly relations between the deceased and defendant, as far as defendant was concerned, were established, then the law will not presume that the killing of the deceased by the defendant was upon former malice, and the jury will in that event determine the guilt of the defendant without reference to such preconceived malice of the defendant." *Held*, That this instruction stated the law correctly, but the failure to give it did not in all probability prejudice the rights of the defendant, for the reason that the jury must have reached the conclusion that all previous difficulties between the deceased and defendant had been amicably settled long before the homicide occurred, and that antecedent malice, if any ever existed, did not enter into the transactions which resulted in the death of the deceased.

*8. Manslaughter—Punishment—Instruction—Error.*

The court instructed the jury that the punishment for manslaughter under the law of the United States was confinement in the penitentiary for a term of not more than three years and a fine of not more than $1000. A recent act made the punishment for manslaughter imprisonment not exceeding ten years and a fine not exceeding $1000. *Held*, That such instruction was a substantial error, prejudicial to defendant's rights, and which would of itself entitle him to a new trial.

*9. Remarks of Counsel—Improper.*

In his closing argument, the District Attorney used the following language: "By your verdicts at this term of the court, you have said the slanderer must keep a civil tongue in his mouth, and here in the Indian Territory men's property is safe from the clutches of the thief and a woman's reputation is safe from the poison of the slanderer." *Held*, That these remarks were improper and unprofessional but in this case probably did not influence the minds of the jury.

*10. Remarks of Counsel—Error.*

If counsel go outside of the record for the purpose of exciting sympathy or raising prejudice in the minds of the jury, to the manifest prejudice of the accused, it would be reversible error not to withdraw the objectionable language from the consideration of the jury.

*11. Jury—Instruction—Punishment.*

The jury, after having been out considering their verdict for several hours, returned into court and stated that they could not agree and asked the court whether there was another penalty for murder than the death penalty. The court informed them there was only one punishment for murder, but that if they found the defendant guilty of murder, they might incorporate a recommendation for mercy in their verdict. Soon after, the jury returned a verdict of guilty with a recommendation for mercy. *Held*, Not error, and that the suggestion of the court and the recommendation of the jury were both in defendant's interest, and he can not complain of that which benefits him rather than prejudices his right.

Appeal from the United States Court for the Southern District.

C. B. KILGORE, Judge.

William R. Watkins appeals from a conviction of murder. Reversed.

*Henry M. Furman, C. L. Herbert, Jesse H. Hill, R. W. Dick,* and *H. H. Browne,* for appellant.

1. The trial court erred in refusing to submit to the jury the special instruction asked by the defendant, as follows: "The jury are instructed that in order to justify homicide upon the grounds of self-defense, it is not necessary that the party killing should have been in actual danger of losing his life, or of receiving serious bodily injury, at the hands of the person killed at the time of the homicide; but it is sufficient to justify the killing if the acts, or words coupled with the acts, of the party killed, viewed from the defendant's standpoint, where such as to reasonably cause the party killing to apprehend that he was in apparent danger of losing his life or having serious bodily injury inflicted upon him by the party killed, he would be justified in killing his antagonist; and it is immaterial whether the danger was real or not, it being sufficient in law to justify homicide if it only be apparent." Jordon vs State, 11 Tex. Ct. App. 448; Bell vs State, 20 Tex. Ct. App. 450; Gonzales vs State, 28 Tex. Ct. App. 131; Allison vs United States, 160 U. S. 203.

2. The trial court erred in charging the jury at the request of counsel for the government, as follows: "The jury are instructed that a party can not himself provoke a difficulty and then slay his adversary upon the ground of self-defense. So that if you find from the evidence in this case, beyond a reasonable doubt, that the defendant Wm. R.

Watkins, himself provoked the difficulty with the deceased, he could not slay Wyatt Williams in self-defense, unless he himself after provoking the difficulty withdrew from the same, in which event his right of self-defense would revive." Mills vs United States, 164 U. S. 644.

3. In a criminal case a defendant has the right to an instruction given to the jury applicable to his own evidence and based upon the hypothesis that it is true. Allison vs United States, 160 U. S. 203; Partlow vs State, 4 S. W. 14; Chambers vs People, 105 Ill. 409; Commonwealth vs Wright, 107 Mass. 403; Smith vs State, 7 Tex. Ct. App. 383; 1 Greenleaf on Evidence § 34; Wharton Crim. Law, § 707; Burrill Crim. Ev. §§ 58, 59.

4. If a defendant provokes a difficulty and then slays his adversary the intent with which the provocation was offered is not only material and vital to his right of self-defense, but also to determine the degree of his guilt in the event his right of self-defense has been abridged. Bishop on Crim. Law § 365, 367; Yoes vs State, 9 Ark. 43; Hicks vs United States, 150 U. S. 449; Benningfield vs Commonwealth, 17 S. W. 272; Thompson vs United States, 155 U. S. 270; White vs State, 23 Tex. Ct. App. 164; Shannon vs State, 28 S. W. 688; Massey vs Commonwealth, 29 S. W. 871.

5. The court erred in refusing to submit to the jury the instruction requested as follows: "The jury are instructed that although the evidence may show that at some time previous to the killing of Wyatt Williams, the defendant, Bud Watkins, had malice towards the deceased yet if it further appears from the evidence that subsequently to such time the said malice on the part of the defendant was abandoned by him, and friendly relations between the deceased and the defendant as far as the defendant was concerned, were established, then the law will not presume that the killing of the deceased by the defendant was upon the

(26)

former malice, and the jury will in that event determine the guilt of the defendant without reference to such preconceived malice of the defendant." State vs Hill, 4 Dev. Batt 491; Smith vs State, 15 Tex. Ct. App. 347; Parker vs State, 18 Tex. Ct. App. 72; White vs State, 23 Tex. Ct. App. 164.

6.   The trial court erred in its charge to the jury, that the punishment for manslaughter under the law was confinement in the penitentiary for a term of not more than three years and a fine of not more than one thousand dollars. If the charge of the court incorrectly instructs as to the penalty of the offense, it is fundamental error, for which the conviction will be set aside, although the error was not excepted to at the time, and although all of the instructions given may have been requested by the defendant. Collins vs State, 5 Tex. Ct. App. 38; Searcy vs State, 1 Tex. Ct. App. 444; Jones vs State, 7 Tex. Ct. App. 339; Veal vs State, 8 Tex. Ct. App. 474; Wilson vs State, 14 Tex. Ct. App. 524.

7.   The trial court erred in stating to the jury at the suggestion of the United States Attorney, that the jury might recommend the defendant to the mercy of the court, such statement being made in the absence of the leading counsel for defendant and over the objections of the counsel for defendant present, and it is not necessary that exceptions be saved at the time. State vs Sneed, 5 Ark. 431; Cole vs State, 10 Ark. 325; Patterson vs State, 7 Ark. 59; Bell Smith vs State, 10 Ark. 540; Sanford vs State, 11 Ark. 540; Burrow vs State, 12 Ark. 70; McBean vs State, 83 Wis. 206; Crawford vs State, 24 Am. Dec. 467; Kelly vs State, 24 S. W. 295.

*A. C. Cruce* and *G. G. Calmes*, for United States.

1.   It is needless for the court to multiply instructions by repeating in substance the same declaration in law.

Sweeney vs State, 35 Ark. 585. If the trial court gives the law correctly, and with sufficient fullness upon the points arising in the case, it is not error to refuse additional requests which simply present the same ideas couched in different language. McCoy vs State, 46 Ark. 152; Railway Co. vs Host, 93 U. S. 291; 2 Thompson on Trials, § 2352, 2403.

2. The instruction that if the jury found the defendant guilty of manslaughter, they could fix his punishment at confinement in the penitentary etc., was given at the solicitation of counsel for defendant. An error which is invited by a party can not be complained of in the Appellate Court. Carter vs United States, 1 Ind. Ter. 342; Elliotts Appellate Procedure, § 626; 2 Thompson on Trials, § 2463.

3. A man can not bring about a quarrel and then justify himself under the law of self-defense, unless he in good faith endeavored to abandon the difficulty and did all within his power consistent with his safety to avert the necessity of killing before the mortal injury. Beard vs United States, 158 U. S. 550; Johnson vs United States, 58 Ark. 57; Aikin vs State, 58 Ark. 544; Sullivan vs United States, 20 S. W. 928; 1 Wharton Crim. Law (9th Ed) § 485; State vs Petsch, 20 S. E. 1002; Garrett vs State, 14 So. 327; Kirby vs States, 79 Ala. 63; Thompson vs State, 9 So. 298; State vs Bruggy, 26 Pac. 756; State vs Bryant, 102 Mo. 24; 14 S. W. 822; State vs Hawkins, 23 Pac. 475; Levy vs State, 12 S. W. 596; Honesty vs Commonwealth, 81 Va. 283; Lee vs State, 21 Tex. App. 241; Habel vs State, 13 S. W. 1002; Brazzel vs State, 13 S. W. 1007.

SPRINGER, C. J. The appellant was indicted October 12, 1896, at Ardmore, in the Southern district of the Indian Territory, for the murder of Wyatt Williams on the 10th day of the same month. On the 18th day of the same month the appellant was placed on trial, and on the Thursday following the jury returned into court a verdict of guilty, in

manner and form as charged in the indictment, adding to the verdict the words, "asking the clemency of the court." On the 10th day of November the motion for a new trial was overruled, and the sentence of death was pronounced on the appellant by the court, fixing the date of his execution for the 19th day of February, 1897. An appeal in due form has been taken to this court, and the execution of the sentence of death has been stayed until the appeal has been heard.

The first error assigned presents the question as to whether the laws of the United States in force in all the states, or the laws of Arkansas, put in force in the Indian Territory, govern in the selection of juries in capital cases in the United States court. The United States Revised Statutes (section 819) limits the government to five peremptory challenges in capital cases, while section 2239 of Mansfield's Digest of the Laws of Arkansas, in force in the Indian Territory, allows the prosecution ten challenges in such cases. Chapter 46 of Mansfield's Digest, entitled "Criminal Procedure," was put in force in the Indian Territory, both by the act of May 2, 1890 (section 33), and by the act of March 1, 1895 (section 4). By the former act the provisions of this chapter were qualified by the words, "as far as they are applicable," but by the last named act there was no qualification or exception whatever. We are therefore of the opinion that in capital and other felony cases the provisions of section 2239 of Mansfield's Digest, which allow the prosecution 10 peremptory challenges, are in force in the Indian Territory, and that the court did not commit any error in allowing that number of challenges in this case.

*Criminal law Peremptory challenges.*

The counsel for appellant withdraws his second assignment of error, and no reference thereto will be made. The third, fifth and sixth assignments involve the same questions of law, and they will be considered together. The third assignment is that the court erred in charging the

jury as follows: " In order to justify homicide on the ground of self-defense, it is not necessary that there should be an actual or real danger to the life or person of the party doing the killing, if there be an appearance of danger caused by the acts or demonstrations of the party killed, or by words coupled with the acts or demonstrations of such party; and if such acts or demonstrations, or such words coupled with them, produce in the mind of the party slaying a reasonable expectation or fear of death or some serious bodily injury to himself, the party killing will be justified, if he acts upon such appearances of danger, and under such reasonable expectation or fear." The fifth assignment was that the court erred in refusing to charge the jury, as requested by appellant, as follows: "The jury are instructed that, in order to justify homicide upon the ground of self-defense, it is not necessary that the party killing should have been in actual danger of losing his life, or of receiving serious bodily injury, at the hands of the person killed at the time of the homicide; but it is sufficient to jus-tify the killing if the acts, or words coupled with the acts, of the party killed, viewed from the defendant's standpoint, were such as to reasonably cause the party killing to appre-hend that he was in apparent danger of losing his life or having serious bodily injury inflicted upon him by the party killed, he would be justified in killing his antagonist; and it is immaterial whether the danger was real or not, it being sufficient, in law, to justify homicide, if it only be apparent." The sixth assignment was that the court erred in refusing to charge the jury as follows: " The jury are instructed that in determining as to whether the defendant is guilty of the offense charged against him they must consider the facts and circumstances detailed in evidence from the defendant's standpoint as they reasonably appeared to him at the time, and not from any other standpoint." Counsel for appellant do not contend that both of these instructions, which were

Instruction.

Instruction

refused, should have been given. The last instruction quoted having been refused, counsel relied upon the other as stating the law in a more modified form. We are of the opinion that the last-named instruction was properly refused. It is too general in its application. In "determining whether the defendant is guilty of the offense charged against him" the jury must pass on every phase and feature of the case. It is only where the homicide is justified on the ground of self-defense, and where the defendant is to judge as to the danger in which he is placed at the time, that the facts and circumstances which constitute the danger are to be viewed from the defendant's standpoint. But we are of the opinion that the first-named instruction should have been given as requested. It is true, the principle embodied in it was given in a modified form. The United States attorney insists that the instruction given by the court on this subject stated substantially all that the rejected instruction covered. He concedes the contention of appellant's counsel "that the defendant is justified in acting upon appearances as they manifest themselves to his mind," and insists that it cannot be reasonably contended "that a jury of sane men could understand anything else from the charge of the court." If the United States attorney regarded the instruction asked by the defendant as substantially the same in effect as that given by the court, it would have been the better practice to have conceded the fact at the time of the trial, and requested the court to give the instruction in the very language requested by counsel for defendant. This would have kept this assignment of error out of the record. The able argument of the United States attorney on this point goes far to sustain his contention that the two instructions are substantially the same in effect. But it ought not to require the assistance of an able lawyer, having a mind trained to statutory constructions, to make clear the meaning of an instruction given to the jury in a capital case. The language

Instruction.
should be
clear.

should be plain, comprehensive, easily understood and free from doubt. But we do not agree with the learned counsel for the government that the two instructions are in all respects substantially the same. The words, "from the defendant's standpoint," in the light of all the testimony in the case. are important, and the defendant was entitled to whatever meaning attaches to them in this case. The court of appeals of the state of Texas correctly states the law on this point. In the case of Bell vs. State, 20 Tex. App. 450, that court says: "To whom must the appearance of danger—the apprehension of the party killing—reasonably appear? To the jury, after hearing all the evidence, after ascertaining the real facts, a great many of which might not, could not be, and were not known to defendant at the time of the killing? Or must the real or apparent danger appear to defendant, at the time of the homicide, to be reasonable? We think the latter is correct. Each juror must place himself in the position of the defendant at the time of the homicide, and determine from all of the facts as they appeared to the defendant at the time of the killing whether his apprehension or fear of death or serious bodily harm was reasonable; and, if so, they should acquit. For, says Mr. Wharton, whether the danger is apparent is to be determined from defendant's standpoint." In the case at bar there were many facts, as appears by the evidence, which were known to the defendant which were not known by any of the eye witnesses, and which facts must have determined the state of his mind from his own standpoint at the time. It appeared from the evidence that threats against defendant, which were made by the deceased two or three weeks prior to the killing, had been brought to his knowledge, and it even appeared from defendant's testimony that he regarded the deceased as one "always waiting to get the advantage of a man," and as a man "who would kill another if he got the drop on him"; that deceased had actually on

another occasion, "throwed a shotgun down on him, and started to kill him." These were matters which doubtless materially assisted in determining defendant's standpoint. They were not a part of "the appearance of danger which were caused by the acts or demonstrations of the party killed, or by words coupled with the acts or demonstrations of such party." But they were facts which produced in the mind of the defendant perhaps a greater fear of death or some serious bodily injury to himself than the acts or demonstrations at the time of the killing. The jury should have been told that the defendant had the right to view such acts or demonstrations from his own standpoint, from his own knowledge of previous threats by the deceased, and from his own opinion as to the dangerous character of the party killed.

The opinion of the Texas court of appeals in the case of Gonzales vs State, 28 Tex. App. 131, 12 S. W. 735, seems quite appropriate in this case. We quote as follows: "There are objections to the charges, which, in our opinion, are sound ones. Upon this issue the charge is, to our minds, not so clear, comprehensive and complete as it should have been. In explaining the rule as to apparent danger it does not distinctly direct the jury that the danger must be judged from the defendant's standpoint, and no other, and from all the circumstances proved. While the charge undertakes to present this principle of law, it falls short, we think, of presenting it clearly, affirmatively, and accurately. Minds uneducated in the nice distinctions of the law would not be likely to discover in the charge the well-established rules relating to apparent danger. These rules should have been presented so plainly and appositively to the evidence as that the jury could not reasonably have overlooked or misunderstood them. The jury should have been told that if, at the time the defendant fired the fatal shot, it reasonably appeared

to him from the circumstances in the case, viewed from his standpoint, that the deceased was then about to shoot him with a gun or pistol, he was justified in killing the deceased, although in fact they might believe that he was in no danger at the time of being shot by the deceased." The opinion in the Gonzales case, as quoted above, should have been qualified, if given as an instruction to the jury in the case at bar, by adding the words: "Unless the jury further believe from the evidence that the difficulty was commenced by the defendant for the purpose of taking the life of the deceased, or inflicting upon him a great bodily harm." See Adams vs People, 47 Ill. 376. This feature of the case will be referred to later on in this opinion. The court fully concurs with the opinion of the supreme court of the United·States in Allison's case, 160 U. S. 216, 16 Sup. Ct. 257, in which the learned chief justice said: "What is or is not an overt demonstration of violence varies with the circumstances. Under some circumstances a slight movement may justify instant action because of reasonable apprehension of danger. Under other circumstances this would not be so. And it was for the jury, and not for the judge, passing upon the weight and effect of the evidence, to determine how this may be. In this case it was essential to the defense that the jury should be clearly and distinctly advised as to the bearing of the threats and the appearances of danger at the moment from the defendant's standpoint." See, also, Campbell vs People, 16 Ill. 17; Maher vs People, 24 Ill. 241; Schnier vs People, 23 Ill. 17.

The fourth assignment of error is as follows: That the trial court erred in charging the jury, at the request of counsel for the government, as follows: "The jury are instructed that a party cannot himself provoke a difficulty, and then slay his adversary upon the ground of self-defense. So that, if you find from the evidence in this case, beyond a reasonable doubt, that the defendant, Wm. R. Watkins, him-

Instruction.

self provoked the difficulty with the deceased, he could not slay Wyatt Williams in self-defense, unless he himself, after provoking the difficulty, withdrew from the same, in which event his right of self-defense would revive.'' This instruction depends for its correctness upon the facts of the particular case in which it may be given. If the facts proven in the case showed that the party who provoked the difficulty did so by attempting to feloniously take the life of his adversary or inflict upon him great bodily injury, or was about to commit a known felony, such as robbery, rape, burglary or a like crime, he could not then slay his adversary upon the ground of self-defense. Such a provocation would forfeit all right to self-defense. In such case the assailed may slay his adversary, and be justified under the law; but, if the party who provoked such a difficulty should slay his adversary, he would be guilty of murder. If the facts disclosed that the party who provoked the difficulty was only guilty of a misdemeanor, that he only intended to chastise his adversary by a simple assault and battery, using no deadly weapon, and intending to inflict no serious injury, he would not entirely forfeit his right of self-defense, however reprehensible his conduct might have been. He would still have what is called an imperfect right of self-defense. If, under such circumstances, the assailed should seize or draw a deadly weapon, and attempt to kill his assailant, the latter, in order to save his own life, or prevent enormous bodily injury, might slay his adversary. In such case he would not be guilty of murder, but of manslaughter. Adams vs People, supra. Again, if the party who provoked the difficulty did so by the mere use of words, however offensive and insulting they may have been, but accompanied by no overt act or demonstration of violence, and without any feloneous intent, and if the party assailed should seize or draw a deadly weapon and attempt to kill his adversary, the latter, in order to save his own life, or to prevent enormous

bodily injury, might slay his adversary; and such being the facts, he would not be guilty of murder, but wonld be justified, or at most be guilty of manslaughter, if, from all the circumstances of the case, such a verdict would be required. A person might inadvertently provoke a difficulty without any intention of even offending another, and, if so, could it be pretended that his right of self-defense was in any manner impaired if the party offended should attempt his death or great bodily injury? But a person who, having malice in his heart, should seek his enemy for the purpose of killing him, and should provoke him to resistance by any means whatever, in order to obtain a pretext for killing him in self-defense, would forfeit entirely such right; and if he should, under such circumstances, slay his enemy, he would be guilty of murder, regardless of the kind or character of the provocation offered, State vs Hays, 23 Mo. 287; note to Stoffer's case, Horrigan & T. Cas. Self-Def. 220-238. Hence, in view of the many kinds of provocation which occur in homicides, and to which the courts must apply the law so as to make it applicable to each particular case, it becomes necessary in this case to refer to the testimony in reference to the provocation of the difficulty; for, in view of the fact that the defendant did provoke the difficulty, if there was any evidence in the case upon which the jury might have mitigated the offense from murder to a lower grade of homicide, the giving of this instruction, excepted to in the fourth assignment of error, was prejudicial to the rights of the defendant, and was such an error as entitles him to a new trial. Keener vs State, 18 Ga. 194; State vs Benham, 23 Iowa 154. The testimony shows that three pistol shots were fired at the time of the homicide; two by the defendant and one by the deceased. There was a random shot fired by the defendant about 15 minutes before the homicide, but this shot was not aimed at the deceased, and there is no evidence in the record tending to show that this random shot had any bearing on

the subsequent killing of the deceased. Both wounds received by the deceased were regarded by the physicians as fatal, especially the one through the right lung and the heart. The shot fired by the deceased did not hit the defendant. We do not deem it necessary to refer to the controversies between the deceased and the defendant which took place long before the fatal shooting. These seemed to have been adjusted. They were evidently not regarded by the jury as constituting the provocation which resulted in the killing of the deceased. The homicide occurred in a restaurant kept by one W. H. Rogers. The defendant was in Rogers' employ as an assistant. He was, therefore, in his own place of business. Rogers was the principal witness for the prosecution, and he testified substantially as follows if reference to the provocation of the difficulty: Wyatt Williams, the deceased, came into the restaurant between 10 and 11 o'clock at night, with a companion, and called for a bottle of hop ale. W. R. Watkins, the defendant, sometimes called Bud Watkins, waited on them. Bud says: "Wyatt, you are a damn nice man, ain't you? You talk one way to me, and some other way to other people." Wyatt says, "I don't know, Bud." But went on, and said, "You are a damn fine man (using a vulgar epithet). Wyatt said, "Yes, I guess I am," and then Bud drew his pistol, and hit it on the bar. After a while—a moment or such a matter—he raised his pistol, and says to Williams, "You was the cause of my brother getting killed." Williams said he reckoned not. Just a moment after he raised his pistol and said: "You are the cause of my brother getting killed," and, with an oath, threw his gun down, and fired towards Williams. Witness then began to leave the room, and when near the door he looked back, and saw that Williams was "just sort of going after his gun," going slow. He looked as if he had been hit. Heard two other shots, fired close together, but was out of the room at that time. Watkins was drinking

that night. Joe Holmes, who was present at the shooting, was a witness for the prosecution, and testified to substantially the same facts as did the witness Rogers. J. C. Percella, a witness for the prosecution, testified that he was on the platform at the door of the restaurant when the shooting began. He saw Watkins walk around behind the counter, when he struck his pistol on the counter and fired. Heard him say, "You have been the cause of my brother being killed, and, damn you, I will kill you," and then fired. Williams straightened up and made a step, and Watkins ran around in front, and fired the second shot, and then dodged out of the door. By that time Williams was in a kind of a falling position, and when falling he fired his pistol. Did not see Williams draw his pistol. He did not have any at the time Watkins fired the first shot. Did not see him make any effort to get any. Witness further testified that Williams said to Watkins, "I am as good a friend as you have got." T. H. Davis, a witness for the prosecution, testified: "I was present. I heard Watkins tell Williams he was the cause of his brother being killed. Williams said, "I reckon not." In a few minutes after that I saw Watkins pull his gun down on the counter, and in a few minutes after that the shooting took place. I saw Watkins shoot at Williams the first time. I did not see Williams do anything at that time. I was not paying much attention then. When this happened, I went out the back way." The foregoing is all testimony as to facts which transpired immediately preceding and at the time of the homicide which was offered by the prosecution. The defendant then took the stand as a witness in his own behalf. He testified, in substance, as follows: "I always thought Williams my friend, until I heard things all the time about him. When he came into Rogers' restaurant, we were eating tamales and drinking. I said to him: 'Wyatt, you always pretend to be a mighty good friend to my face; but when you are at my back you are talking about me all

the time.' He says, 'Bud, don't abuse me that way.' I think I had my pistol down under the counter, or I had it on. He went down, just like he was going to pull his pistol out. I pulled mine up, this way, and he put his hand back. When I put mine back, he made for his, and it hung on his gallows. I jerked mine up." Here witness was interrupted, because not understood. Witness continued: "At first he went down, sort of, after his pistol. I had mine, and he seen I would beat him to it. He taken his hand away, and I put mine back. Just as I put mine back—just as I put mine back, he made a grab for his, and it sort of hung on his gallows. I jerked mine from under the counter. I was standing sort of behind. I jumped. I shot, and jumped out of the door, and shot again. He shot right after I shot the first shot. He was sort of coming up to me. I jumped out side the door and shot. He was coming towards me. Just as Williams shot, I shot again. His shot and mine, went right together." Defendant further testified that one Bridgemyer, almost two weeks before the shooting, told him that "Williams said to him if he ever got into a difficulty with me he would kill me." Also that one G. C. Bontmel told him about three weeks before the tragedy that Williams said to him if "I ever monkeyed with him, and give him an opportunity, he would put the fixings on me; he would fix me; kill me, I believe." Bridgemyer and Bontmell, having been called as witnesses for the defendant, substantially confirmed these statements. John Jones, called as a witness by defendant, testified that on the Tuesday before the killing Williams said to him: "Watkins will be killed right where he is, in the place of business he is in. He will be killed there. Whoever kills him, there will be nothing said or done about it. The way he has been doing, if somebody kills him that will be the last of it." He remarks: "Just like Patton [his brother.] When Patton was killed, Jim and Bud forgot him in a few days." W. A. Watts testified on be

half of defendant that Williams told him about 10 days be-
fore the killing he expected to have a racket with Watkins
in the future; he hoped not; that he would never take as
much off him in the future as he had heretofore; never would
take that off him again.  The conversations testified to by
Jones and Bontmell were not communicated to the defend-
ant prior to the homicide, so far as the record discloses.
The defendant, on cross-examination, testified as follows:
"I thought this about Williams:  He was always waiting for
the advantage of a man.  I always watched him.  He was a
man I thought would kill a man if he got the drop on him.
I have watched him for two or three years.  He throwed a
shotgun down on me one time, and started to kill me and
some fellows."  Such is a brief summary of the evidence on
his point.

Now, let us consider the instruction in question in
view of the foregoing testimony.   "The jury are instructed,"
says the court, "that a party cannot himself provoke a
difficulty, and then slay his adversary upon the ground of
self-defense.   So that, if you find," etc , that the defendant
himself provoked the difficulty with the deceased, he could
not slay Wyatt Williams in self-defense, unless he himself,
after provoking the difficulty, withdrew from the same, in
which event his right of self-defense would revive."   It is
clear from all the testimony in the case that the provocation
to which the minds of the jury were directed by this instruc-
tion was the use of the words which the defendant uttered
towards the deceased just before the homicide occurred.
The defendant therefore must have provoked the difficulty.
The jury could not find otherwise.   But there is no evidence
tending to show that "the defendant, after provoking the
difficulty, withdrew from the same."   Hence, under this in-.
struction, the defendant's plea of self-defense could not be
considered by the jury.   He had forfeited his right to defend

himself, even if the deceased had attempted, as testified to
by the defendant, to use his pis'ol, after the defendant had
put his own pistol away.   No words, however aggravating,
no libel, however scandalous, will authorize the suffering
party to revenge himself by blows.   No man can take
vengeance into his own hands.   He can use violence only in
defense of his person.   Com. vs Selfridge, Horrigan & T.
Cas. Self-Def. 26.   The Selfridge Case, just cited, is a lead-
ing authority on this subject.   Selfridge provoked the diffi-
culty by publishing in a Boston newspaper a card, over his
own signature, denouncing the father of the deceased as "a
coward, liar, and scoundrel."   The son met Selfridge on the
street, the day of the publication, and proceeded to castigate
him with a cane.   Selfridge immediately drew a pistol, and
shot his assailant dead.   He was indicted for the crime of
manslaughter, and on trial before a jury was acquitted
The case was therefore not reported.   But as it was tried
before the Supreme Judicial Court of Massachusetts, and as
the defendant was a prominent lawyer of the Boston bar, the
case attracted universal attention. .Theophilus Parsons, C
J., delivered a special charge to the grand jury which in
vestigated the case and found the indictment.   The justices
of the court were Theodore Sedgwick, Samuel Sewell, and
Isaac Parker.   The case was tried in 1808.   Parker, J., pre
sided at the trial, and charged the jury.   His charge in thi
case is conceded to be one of the ablest interpretations of
the law of self-defense which is found in our jurisprudence
But more recent jurists have expounded the law of self-de
fense even more liberally to the accused than did the learne
judge in the Selfridge Case.   After Mr. Justice Parker ha
severely condemned Selfridge for making the publicatio
indicated, and after commenting feelingly upon the conduc
of the son who thus sought to avenge an insult upon hi
father, he admonished the jury that no person can resort t
force to avenge an insult consisting of words, howeve

opprobrious, or writings, however defamatory. Notwithstanding Selfridge provoked the difficulty by the scandalous publication indicated, yet the learned judge instructed the jury that, if the defendant did not purposely throw himself in the way of the attack, but was pursuing his lawful vocation, and that in fact he could not have saved himself otherwise than by the death of the assailant, then the killing was excusable, provided the circumstances of the attack would justify a reasonable apprehension of the harm which he would thus have a right to prevent. Com. vs Selfridge, Horrigan & T. Cas. Self-Def. 27. The jury, having been thus instructed, returned a verdict of not guilty. But suppose the jury in the Selfridge Case had been instructed, as was the jury in the case at bar, "that a party cannot himself provoke a difficulty, and then slay his adversary upon the ground of self-defense," what other verdict could the jury have rendered in the Selfridge Case except a verdict of guilty? See State vs Kennedy, 20 Iowa 569; State vs Deckotts, 19 Iowa 447; State vs Benham, 23 Iowa 154; Adams vs People, supra. In the note to Stoffer's Case, cited supra, the authors sum up their review of the authorities upon this subject as follows: "It finally remains to consider of what degree of homicide a person is guilty who provokes the combat or produces the occasion in which he is forced to kill another in his own defense. A full discussion of this question might lead us into many nice distinctions, and take us beyond the reasonable limits of a note. We shall only advert to two leading distinctions: First. If he provoked the combat or produced the occasion in order to have a pretext or killing his adversary, or doing him great bodily harm, the killing will be murder, no matter to what extremity he may have been reduced in the combat. 1 Hawk. P. C. Curw. Ed.) p. 87, § 18; Id. p. 97, § 26; State vs Hill, 4 Dev. & B. 491; Stewart vs State, 1 Ohio St. 66; Adams' Case, supra. Second, But if he provoked the combat or produc-

(27)

ed the occasion without any felonious intent, intending, for instance, an ordinary battery merely, the final killing in self-defense will be manslaughter only. Adams' Case, supra." One other distinction might have been set forth, namely, that which occurred in the Selfridge Case. If the provocation was by mere words, without any hostile demonstration, and without malice, the final killing in self-defense will be neither murder nor manslaughter, but justifiable homicide. Those distinctions were not explained in the charge to the jury in the case at bar. They were all applicable, and it was error in the trial court to fail to state fully and correctly to the jury the law upon this subject. As was stated by the Supreme Court of the United States in the case of Mills vs U. S.: "No portion of the charge of the court can be said to be harmless if it did not state correctly and fully the law applicable to the crime, even though it may be urged that in other portions of the charge the correct rule was laid down. * * * When the life of the defendant is at stake, we feel that it is impossible to permit him to be executed in consequence of a conviction by a jury under a charge of the court which, we think, in some of its features, was clearly erroneous in law, because not full enough even though in some parts of the charge a more full and correct statement of the law was given. The opinion in the Mills Case was handed down January 4, 1897, and it is reported in 164 U. S. 644, 17 Sup. Ct. 210. Without intimating or expressing the slightest opinion as to the sufficiency of the testimony upon which the defendant in the case at bar based his right of self-defense, we are of the opinion that the facts which we have set forth in detail, in connection with others in the record, were such as to have entitled the accused to the consideration by the jury of the law upon which he rested his defense, and, consequently, that it was error in the court to fail to state the law fully and correctly on this subject at the time the instruction excepted to in the fourth assignment of

error was given. Keener vs State, 18 Ga. 194. The instruction, as given, presented properly the contention of the prosecution; but it should have been qualified by stating the facts which would support that contention, and it should have been followed by other instructions presenting fully and correctly the theory upon which the defendant relied for his defense. A defendant in a criminal case has a right to have an instruction given based on his own testimony, although contradicted by the testimony of the prosecution. State vs Partlow (Mo. Sup.) 4 S. W. 14; Chambers vs People, 105 Ill. 409; Allison vs U. S., 160 U. S. 203, 16 Sup. Ct. 252. The jury were not bound to believe the testimony of the defendant. The court might with propriety have called their attention to this fact, and to the further fact that in determining what weight and credit they would give to his testimony they might take into consideration his circumstances, the great temptation which one so situated was under to so speak as to procure an acquittal, but that they should weigh his testimony carefully, and pass upon it the same as upon all other testimony in the case.

*Testimony of Defendant— Credibility.*

The seventh and eighth assignments of error will be considered together. The defendant's counsel asked the court to instruct the jury as follows: "The jury are instructed that, although the evidence may show preconceived malice on the part of the defendant, Bud Watkins, toward the deceased, Wyatt Williams, yet if the evidence further shows that fresh provocation occurred on the part of Wyatt Williams toward the said Bud Watkins between the preconceived malice and the death of the said Wyatt Williams, then the law will [not] presume that the killing was upon the antecedent malice." The word "not," which we have inserted in brackets, was by inadvertence omitted. "The jury are instructed that, although the evidence may show that at some time previous to the killing of Wyatt Williams the defendant, Bud Watkins, had malice towards the de-

ceased, yet if it further appears from the evidence that sub-
sequently to such time the said malice on the part of the de-
fendant was abandoned by him, and friendly relations be-
tween the deceased and the defendant, as far as defendant
was concerned, were established, then the law will not pre-
sume that the killing of the deceased by the defendant was
upon former malice, and the jury will in that event deter-
mine the guilt of the defendant without reference to such
preconceived malice of the defendant." The Supreme
Court of North Carolina, in the case of State vs Hill, lays
down the law correctly on this point. The court in that case
held that, "when two persons have formerly fought on
malice, and are apparently reconciled, and fight again on a
fresh quarrel, it shall not be contended that they were
moved by the old grudge, unless it so appear from the cir-
cumstances of the affair." 4 Dev. & B. 491; 1 Hawk. P. C.
(Curw. Ed.) bk. 1, c. 13, § 30. It was not necessary to give
both of these instructions. The giving of the latter would
have been sufficient. It certainly stated the law correctly.
But whether, in this case, it was reversible error to have
refused it, it is not necessary to determine. The failure to
give it did not, in all probability, prejudice the rights of the
defendant, for the reason that the jury must have reached
the conclusion that all previous difficulties between the
deceased and the defendant had been amicably settled long
before the homicide occurred; and that antecedent malice,
if any ever existed, did not enter into the transactions which
resulted in the death of the deceased.

The defendant's counsel abandons his ninth, tenth and
eleventh assignments of error. The twelfth assignment is
"that the trial court erred in charging the jury that the
punishment for manslaughter under the law of the United
States was confinement in the penitentiary for a term of not
more than three years and a fine of not more than one

*Margin notes:*
Instruction—
Former
malice.

Former
malice—
Presumption

Instruction
refused. Not
error.

thousand dollars." At the time of the trial in this case the counsel on both sides and the court were unaware that congress had recently amended the law as to manslaughter so as to read as follows: "That whoever shall hereafter be convicted of the crime of manslaughter in any court in the United States, in any state or territory, including the District of Columbia, shall be imprisoned not exceeding ten years, and fined not exceeding one thousand dollars." 1 Supp. Rev. St. U. S., 85. Counsel for the government insists that, as the jury found the defendant guilty of murder, and as the instruction as to the punishment of manslaughter was given at the instance of the defendant's counsel, the error did not prejudice his substantial rights, and that defendant could not now, in this court, for the first time complain of the error. Under the peculiar circumstances of this case, and in view of the fact that the jury evidently hesitated about returning a verdict of guilty by reason of the death penalty being the only punishment which could then be inflicted if a verdict of guilty of murder were returned, and by the further reason that the law as to manslaughter as given to the jury permitted imprisonment not exceeding three years and a fine of $1,000, which may have seemed inadequate punishment, in the light of all the evidence, we are inclined to the opinion that the giving of the law by the court without reference to the amendment, which was in force, and which permitted imprisonment for as much as ten years, was a substantial error, prejudicial to defendant's rights, and which would of itself entitle him to a new trial. Who can say that, if the law as to the punishment of manslaughter had been correctly given to the jury, they might not have found the defendant guilty of manslaughter, and fixed his punishment at imprisonment in the penitentiary for a period of ten years? Whatever might have been the verdict if the law had been correctly stated, the defendant was entitled to the judgment of the jury under

Instruction—
Erroneous
statement of
law—Error.

the law as it was. A note at the close of the case of State vs Scott, 4 Ired. 409, decided by the Supreme Court of North Carolina, states the law correctly, in our opinion: "It would be an inhuman rule of law that would require an ignorant defendant in a criminal case to suffer through the manifest mistake or omission of his counsel. Such a rule would be scarcely more tolerable than that which obtained until a recent period in England, which denied the prisoner the benefit of counsel altogether in capital cases, and compelled an illiterate prisoner to defend his own case, pitted against the highest legal skill the government could bring against him, except where points of law were debated." Horrigan & T. Cas. Self. Def., 175. In the case at bar the error was not that of the counsel for the defendant alone, but equally the error of the government counsel and of the court. Since the case at bar was tried, congress has passed an act materially changing the punishment in capital cases. The jury may now, if they find the defendant guilty of murder, add to their verdict the words, "without capital punishment"; and if such words are added the punishment will be imprisonment for life. If a United States Court should, in trials of capital cases subsequent to the passage of this act fail to instruct the jury as to the punishment, and as to their right to reduce it from death to imprisonment for life, would not this be reversible error, even though the attorneys on both sides and the court were all ignorant of the new law? While the defendant in this case was not entitled to the benefit of the new law when previously tried, as the law had not then been passed, yet at a subsequent trial he will be entitled to the leniency which the new law may provide. This is not a reason for granting the defendant a new trial, but it is a fact that is worthy of consideration in resolving the doubts that arise in the case.

The thirteenth assignment of error was based upon the following remarks made by the counsel for the govern-

ment in his closing argument to the jury: "By your ver-
dicts at this term of the court you have said that the slan-
derer must keep a civil tongue in his mouth; and here, in
the Indian Territory, men's property if safe from the
clutches of the thief, and a woman's reputation is safe from
the poison of the slanderer." We are of the opinion that
the remarks complained of and to which exception was taken
should have been withdrawn from the jury, yet we are fur-
ther of the opinion that they did not influence the minds of
the jury in making up their verdict. Counsel, however, on
the part of the people and on the part of the defendant also,
should be careful in all cases to confine their remarks to the
jury strictly to the facts and to the law of the case. It is
unprofessional to go outside the record for the purpose of
exciting sympathy or arousing prejudice in the minds of the
jury; and whenever the privileges of counsel are abused, to
the manifest prejudice of the accused, it would be reversible
error not to withdraw the objectionable language from the
consideration of the jury. Every person accused of crime
is entitled to a fair and impartial trial upon the evidence in
the case and upon the law applicable thereto.

The fourteenth and last assignment of error was that
the trial court erred in stating to the jury, at the suggestion
of the United States attorney, that the jury might recom-
mend the defendant to the mercy of the court if they should
return a verdict of guilty. The jury after having been out
considering their verdict for several hours, returned into
court and stated to the court that they had not agreed and
could not agree. The jury asked the court on another occa-
sion whether there was another penalty for murder than the
death penalty. The court informed them that there was
only one punishment for murder, but that, if they found the
defendant guilty of murder, they might incorporate a rec-
ommendation for mercy. The jury were then conducted

*Margin note:* Remarks of Counsel— Harmless error.

into their room, and in a short time thereafter they returned a verdict of guilty, with a recommendation for mercy. It was explained to the jury that the court had no power to extend clemency, but it would be for the president of the United States to determine whether executive clemency should be extended in the case. Counsel for defendant contend that the verdict was not a fair expression of the opinion of the jury; that they had refused to convict until the suggestion complained of was made by the trial court. These interviews with the jury took place in the absence of Mr. Furman, the leading counsel for the defense, but in the presence of Mr. Dick, his partner. Mr. Dick asked that Mr. Furman be sent for; that he would not agree to anything in his absence. But Mr. Furman was not sent for, and no formal exceptions were taken by Mr. Dick to the suggestions made by the court to the jury in reference to a recommendation for clemency. Under the circumstances we are of the opinion that the defendant is entitled to the exception, and to have it considered by this court. But we are of the opinion that the defendant's rights were in no way prej-

Statement by court—Not error.

udiced by the information given to the jury by the court, or by the suggestion as to a recommendation for clemency. The jurors were correctly informed as to the law—that there was but one punishment as the law then stood for murder, and that the jury might add a recommendation for clemency. The jurors well knew that such a recommendation would find its way to the proper authorities for consideration. It is no uncommon occurrence for juries to accompany their verdicts with a recommendation for clemency. Such recommendations always have due consideration and the courts generally give them effect. In the case at bar the recommendation would undoubtedly have been sent to the president of the United States. The counsel for the defendant himself would have seen to it that so important a matter in the interest of his client was brought to the president's at-

tention. The suggestion of the court and the recommendation of the jury were both in the defendant's interest, and he cannot now be heard to complain of that which benefits him rather than prejudices his right.

As this is the first capital case which has been tried in the United States courts in the Indian Territory, we have very carefully considered all the errors assigned, even at the risk of being regarded as tedious. It is necessary, in entering upon this important jurisdiction, to carefully consider the law of every case, in order that no errors may be committed which will vex us and those who may come after us in the interpretation and enforcement of the law. For the reasons given in this opinion, we have reached the conclusion that there are errors disclosed by the record in this case which entitle the defendant to another trial. The verdict of the jury is therefore set aside, a new trial awarded, and the case remanded.